The COUNTY OF BERGEN; the Borough of Franklin Lakes; the Township of Montville; the Franklin Lakes Home-owners Committee Against I–287; the New Jersey Citizens Coalition To Stop I–287; and the Passaic River Coalition, Plaintiffs,

v.

Elizabeth Hanford DOLE, as the Secretary of the United States Department of Transportation; the United States Department of Transportation; Ray Barn-hart, as the Federal Highway Administrator; John G. Bestgen, Jr., as the Regional Administrator of Region 1 of the Federal Highway Administration; John J. Kessler, Jr., as the Division Administrator of the New Jersey Division of the Federal Highway Administration; the Federal Highway Administration; James G. Watt, as the Secretary of the United States Department of the Interior; the United States Department of the Interior; Lee Verstandig, as the Acting Administrator of the United States Environmental Protection Agency; Jacqueline E. Schafer, as Administrator of Region 2 of the United States Environmental Protection Agency; the United States Environmental Protection Agency; John P. Sheridan, Jr., as the Commissioner of Transportation of the New Jersey Department of Transportation, and the New Jersey Department of Transportation, Defendants.

Civ. A. No. 82–4065.

United States District Court,
D. New Jersey.

Oct. 10, 1985.

David Paget, New York City, for all plaintiffs.

William T. Smith, Franklin Lakes, N.J., for Franklin Lakes.

Priscilla Triolo, Hackensack, N.J., for Franklin Lakes Homeowners Committee Against I-287 and New Jersey Citizens Coalition to Stop I-287.

Valerie F. Mauceri, Asst. U.S. Atty., Newark, N.J., for U.S. Dept. of Transp., Federal Highway Admin., U.S. E.P.A., and U.S. Dept. of Interior.

Michael R. Dressler, Hackensack, N.J., Bergen County Counsel.

Lawrence K. Eismeier, Boonton, N.J., for Montville.

Alfred Porro, Lyndhurst, N.J., for Passaic River Coalition.

John J. Maiorana, Deputy Atty. Gen., Div. of Law, Trenton, N.J., for N.J. Dept. of Transp.

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| GLOSSARY | 1012 |
| I. SCOPE OF REVIEW | 1016 |
| II. FINDINGS OF FACT | 1017 |
| A. Procedural History of the I-287 Project | 1017 |
| B. Findings of Fact as to Each of Plaintiffs' Claims | 1039 |
| III. CONCLUSIONS OF LAW | 1049 |
| A. Overview of NEPA, DOTA and FAHA | 1049 |
| B. Standard of Review | 1052 |
| C. Conclusions of Law as to Each of Plaintiffs' Claims | 1054 |
| IV. CONCLUSION | 1066 |

## GLOSSARY

| ABBREVIATION | EXPLANATION |
|---|---|
| ACOE | Army Corps. of Engineers |
| Action Plan | New Jersey Action Plan |
| APA | Administrative Procedure Act 5 U.S.C. § 701 et seq. |
| CEQ | Council on Environmental Quality |
| Citizens Coalition | New Jersey Citizens Coalition to Stop I-287 |
| DEIS | Draft Environmental Impact Statement (A.R., Vol. 3, Item 24) |
| DOI | United States Department of Interior |
| DOTA | Department of Transportation Act of 1966, 49 U.S.C. § 101 et seq. |
| E.O. 11988 | Executive Order 11988, 42 Fed. Reg. 26951, May 24, 1977 |
| E.O. 11990 | Executive Order 11990, 42 Fed. Reg. 26961, May 24, 1977 |
| E.O. 12372 | Executive Order 12372, Fed. Reg. 30959, July 14, 1982 |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act 16 U.S.C. § 1531 et seq. |
| FAHA | Federal-Aid Highway Act, as amended, 23 U.S.C. § 101 et seq. |

| ABBREVIATION | EXPLANATION |
| --- | --- |
| FEIS | Final EIS/Section 4(f) Evaluation (A.R., Vol. 24, Item 101) |
| FEMA | Federal Emergency Management Administration |
| FHWA | Federal Highway Administration |
| FWCA | Fish and Wildlife Coordination Act 16 U.S.C. § 661 et seq. |
| Homeowners Committee | Franklin Lakes Homeowners Committee Against I–287 |
| HUD | U.S. Department of Housing and Urban Development |
| ICA | Intergovernmental Cooperation Act of 1968 31 U.S.C. § 6501 et seq. |
| I–287 | Interstate Route 287 of the National System of Interstate and Defense Highways, commonly known as the "Interstate Highway System." |
| NEPA | National Environmental Policy Act 42 U.S.C. § 4321 et seq. |
| NHPA | National Historic Preservation Act 16 U.S.C. § 470f |
| NJDEP | New Jersey Department of Environmental Protection |
| NJDOT | New Jersey Department of Transportation |
| NJEO 53 | New Jersey Executive Order 53 |
| NJERA | New Jersey Environmental Rights Act N.J.S.A. § 2A:35A–1 et seq. |
| NJTPB | New Jersey Transportation Planning Board |
| OMB | U.S. Office of Management and Budget |
| PFEIS | Preliminary Final Environmental Impact Statement/ Draft Section 4(f) Evaluation (A.R., Vol. 15, Items 78A–78D) |
| PPM 20–8 | Policy and Procedure Memorandum 20–8 of the Federal Highway Administration |
| PRC | Passaic River Coalition |
| PS & E | Plans, Specifications & Estimates |
| USDOT | United States Department of Transportation |
| V/C Ratio | Volume to Capacity Ratio |

## OPINION

HAROLD A. ACKERMAN, District Judge.

Interstate 287 (hereinafter "I–287") was designated as part of the original interstate highway system in 1956. It was never completed. The plaintiffs herein seek to enjoin the construction of the remaining 20.6 mile stretch from the terminus of United States Route 202 in Montville Township, Morris County, New Jersey to the New York State Thruway in Suffern, New York. The Administrative Record, affidavits, briefs and correspondence submitted to the court in this vigorously litigated action to bar the planned construction are themselves sufficient to pave the remaining twenty miles. The Assistant United States Attorney representing the federal defendants to this action has stated that "[t]his case holds the record in the U.S. Attorney's Office, both criminal and civil, for the highest xeroxing bill and the most amount of paper ever submitted to the U.S. District Court, at least of recent vintage, in the last 15 years." See Transcript of hearing, February 14, 1984 at 17. Taken literally or metaphorically, this statement confirms this court's impression that the gargantuan 46 volume Administrative Record in the instant litigation has not often been surpassed.

The plaintiffs herein are the County of Bergen, the Borough of Franklin Lakes (Bergen County), the Township of Montville (Morris County), Franklin Lakes Homeowners Committee Against I–287, New Jersey Citizens Coalition to Stop I–287 and the Passaic River Coalition. Three other plaintiffs, the Township of Pequannock, the Borough of Pompton Lakes and the Township of Mahwah have withdrawn from this litigation by consent orders filed with this court.

The defendants are a variety of individuals and agencies of the state and federal governments. The so-called "federal defendants" are as follows: the United States Department of Transportation (hereinafter "USDOT"), Elizabeth Hanford Dole in her capacity as Secretary of USDOT, the Federal Highway Administration (hereinafter "FHWA") (an administration within USDOT), Ray Barnhart in his capacity as Administrator of FHWA, John G. Bestgen, Jr. in his capacity as Regional Administrator of Region 1 of FHWA, John Kessler, Jr. in his capacity as Division Administrator of

the New Jersey Division of FHWA, the United States Department of the Interior (hereinafter "DOI"), James G. Watt in his capacity as former Secretary of DOI,[1] the Environmental Protection Agency (hereinafter EPA), Lee Verstandig in his capacity as the Acting Administrator of EPA[2], and Jacqueline E. Schafer in her capacity as the Administrator of Region 2 of EPA. The so-called "state defendants" are the New Jersey Department of Transportation (hereinafter "NJDOT") and John P. Sheridan, Jr. in his capacity as the Commissioner of NJDOT.

Plaintiffs seek declaratory and injunctive relief. They allege that the administrative process resulting in the approval of the I–287 highway project violated the Department of Transportation Act of 1966 as amended, 49 U.S.C. § 101 et seq. (hereinafter cited as "DOTA"); the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (hereinafter cited as "NEPA") and the regulations promulgated thereunder; the Federal Aid Highway Act as amended, 23 U.S.C. § 101 et seq. (hereinafter cited as "FAHA"), and the regulations promulgated thereunder; and Policy and Procedure Memorandum 20–8 (hereinafter cited as "PPM 20–8") superseded in 1974 by regulations codified at 23 C.F.R. Parts 771 and 790. Plaintiffs further allege violations of the Intergovernmental Cooperation Act of 1968, 31 U.S.C. § 6501 et seq. (hereinafter cited as "ICA"); the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq. (hereinafter cited as "FWCA"); the Endangered Species Act, 16 U.S.C. § 1531 et seq. (hereinafter cited as "ESA"); section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f (hereinafter cited as "NHPA"), and the regulations promulgated thereunder and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (hereinafter cited as "APA"). In addition, plain-

tiffs allege that defendants violated Executive Order 11990, 42 Fed.Reg. 26961, May 24, 1977 (hereinafter cited as "EO 11990"); Executive Order 11988, 42 Fed.Reg. 26951, May 24, 1977 (hereinafter cited as "EO 11988"); Executive Order 12372, 42 Fed. Reg. 30959, July 14, 1982 (hereinafter cited as "EO 12372"); the New Jersey Environmental Rights Act, N.J.Stat.Ann. 2A:35A–1 et seq. (hereinafter cited as "NJERA"); New Jersey Executive Order 53, October 15, 1972 (hereinafter cited as "NJEO 53") and the New Jersey Action Plan (hereinafter "Action Plan") adopted pursuant to FAHA by FHWA and NJDOT.[3] In short, plaintiffs allege that the various environmental implications of the I–287 extension were not adequately considered by the defendants pursuant to the requirements of state and federal law.

Both state and federal defendants filed answers to the instant complaint denying the allegations therein and setting forth various defenses. Federal defendants filed Volumes 1 through 27 of the Administrative Record and state defendants filed Volumes 28 through 44 of the Administrative Record containing those documents in their respective possession.

A hearing was held before Judge Biunno of this District on September 27, 1983. In a Memorandum dated September 29, 1983 and a Memorandum and Order dated October 12, 1983, Judge Biunno set forth a scheme of case management and a system of determining the proper contents of the Administrative Record for purposes of review which has been vehemently disputed by plaintiffs at every opportunity. Regarding the contents of the Administrative Record, Judge Biunno noted the appropriate standard and scope of review of an administrative action by a United States District Court and ordered the following:

---

1. Donald P. Hodel has since been named Secretary but has not yet been substituted in the caption of this case.

2. Mr. Verstandig has since been succeeded by William D. Ruckelshaus as Administrator of EPA.

3. These are the causes of action alleged by plaintiffs in their amended complaint. Plaintiffs have not addressed all of these statutory grounds for relief in their point briefs and any ground for relief not briefed shall be deemed waived by this court.

The 44-volume administrative record filed by the federal and state defendants may be supplemented through agency procedures initiated by plaintiffs ... to the extent that requests to an agency to supplement the record are denied, the administrative record of that request, its subject matter, its disposition and the reasons therefore shall be served and filed by the agency involved as a supplement to the present administrative record and plaintiffs may serve and file a point brief thereon.

Judge Biunno further held that "the usual pretrial mechanism for depositions, interrogatories and other forms of judicial discovery employed when a trial court compiles its own evidential record shall not be applicable to this proceeding" and that "[t]he administrative record filed .by [defendants] ... is far too massive ... to make a traditional 'summary judgment' motion a prudent mechanism for review and decision." *See* Memorandum dated September 29. In sum, for the reasons stated therein and summarized in the opinion of this court rendered orally on February 14, 1984, *see* Transcript at 27, Judge Biunno held that the case would be "tried" mainly by presentation of argument after the submission of point briefs and not through a formal hearing at which testimony would be introduced.

On February 14, 1984, a hearing was held before this court on plaintiffs' motion to settle the record, compel discovery and set the case down for trial. In essence, plaintiffs sought reconsideration of Judge Biunno's rulings in this regard. In my oral ruling rendered at the hearing, I held that a determination on the disputed contents of the administrative record would be deferred until this court reviewed the agency decision at issue on its merits. Second, I held that Judge Biunno's order precluding the parties from employing the usual means of discovery under the Federal Rules of Civil Procedure was not clearly erroneous and, in fact, was eminently correct in light of the permissible scope of review and the absence of any showing of agency bad faith. Further, I found "that

this court may look outside the record to ... submissions [of the parties] as background, and for their evidentiary value in determining whether the agency considered the relevant factors in making its decision." *See* Transcript of hearing, February 14, 1984 at 36 (citations omitted). Finally, I set up a schedule for submission of extra-record evidence, noted that such submission would be limited to the issues already briefed by the parties and admonished the parties that the "focal point" of the court's review would remain the administrative record itself. *Id.* at 38. To the extent that Judge Biunno had ruled to the contrary, I found his previous order to be clearly erroneous pursuant to a recognized exception to the law of the case doctrine. *Id.; see Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983).

By letter opinion dated April 18, 1984, I decided to clarify my February 14 ruling regarding the contents of the administrative record. I held that with regard to those documents already in plaintiffs' possession, this court would review the agency's decision whether or not to include them in the administrative record under the applicable standard of review pursuant to Judge Biunno's order. Regarding those documents not already in plaintiffs' possession but either known or suspected to exist and excluded from the administrative record submitted to this court by the defendants, I held "that in light of the standard of review and because there is insufficient evidence at this time that the agency has withheld documents in bad faith, or that the Record is too sketchy to permit meaningful judicial review, this court will accept the unilateral decision of the agency regarding· the inclusion or exclusion of these additional documents." *See* Letter Opinion of April 18, 1984 at 3. I further cautioned defendants "that they should err on the side of over-inclusiveness in their submissions to the court" and noted that "[a]t the *very least,* however, the record should include *all* relevant studies or data used or published by the agency compiling

the [environmental impact] statement." *Id.* quoting *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1384 n. 9 (2d Cir.1977) (emphasis added). Finally, I ordered defendants to file an affidavit "stating definitively and briefly whether 'all relevant studies or data used or published' by the agencies in question in preparing the EIS have been submitted to the court either by filing or *in camera* and if they have not been submitted, an explanation of this fact." *See* Letter Opinion of April 18, 1984 at 4.

All submissions to this court having been completed and oral argument of the parties having been heard, the parties await this decision reviewing the merits of the administrative approval of the I–287 extension in light of the governing law.

In the litany of federal and state statutes and regulations under which plaintiffs seek relief, three federal statutes predominate: NEPA, DOTA and FAHA, *see* Conclusions of Law *infra.* I turn now to the appropriate scope of review by a district court in cases under these statutes.[4]

## I. SCOPE OF REVIEW

It is not disputed that as a general matter, judicial review in a case such as this one "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). The Supreme Court has made clear that the reviewing court may neither perform a *de novo* review of the merits of the agency decision, *see Camp v. Pitts,* 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973), nor base its review on "litigation affidavits" containing *post hoc* rationalizations by agency officials in lieu of the whole administrative record compiled by the agency. *See Overton Park,* 401 U.S. at 419, 91 S.Ct. at 825. In sum, "the focal point for judicial review should be the administrative record already in ex-

istence, not some new record made initially in the reviewing court." *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244.

At times, however, the "bare record" may not disclose information sufficient to enable a court to meaningfully review the agency decision under the appropriate standard. In such cases the court may require the participating administrative officials to give testimony or submit affidavits to supplement the record. *See Camp,* 411 U.S. at 142–43, 93 S.Ct. at 1244; *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825. "Of course, such inquiry into the mental processes of administrative decision makers is usually to be avoided. *United States v. Morgan,* 313 U.S. 409, 422 [61 S.Ct. 999, 1004, 85 L.Ed. 1429] (1941)." *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825. Similarly, where there has been a substantial showing that "documents which are properly part of the administrative record have been withheld" by the agency in bad faith, the traditional tools of discovery under the Federal Rules of Civil Procedure may be utilized. *See Natural Resources Defense Council, Inc. v. Train,* 519 F.2d 287, 292 (D.C.Cir.1975); *Quincy Oil Inc. v. FEA,* 468 F.Supp. 383, 387 (D.Mass.1979). As noted *supra,* I have already ruled that neither of those two situations are present in the instant litigation.

■ It is clear, as I have earlier held, that evidence outside the administrative record may be introduced in the district court to facilitate examination of the administrative record under the applicable standard of review. *See* discussion of standard of review *infra; see generally, Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823. As I noted in my oral ruling of February 14, the Second Circuit has stated that:

[I]n NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alter-

---

**4.** I note that no party has argued that the scope of review in any way varies depending on the nature of the particular legal claim. Regardless

of the legal theory invoked, this case involves review of administrative agency action.

natives ... which can sometimes be determined only by looking outside of the administrative record to see what the agency may have ignored.... Generally ... allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism ... under the rug,' *Silva v. Lynn,* 482 F.2d [1282] at 1285 [ (1st Cir. 1973) ], raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters....

*See County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1384–85 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) quoted in Transcript of hearing, February 14, 1984 at 36; *accord PPG Industries, Inc. v. Costle,* 630 F.2d 462, 466 (6th Cir.1980); *Asarco, Inc. v. United States Environmental Protection Agency et al.,* 616 F.2d 1153, 1159–60 (9th Cir.1980); *Hough v. Marsh,* 557 F.Supp. 74, 84 n. 12 (D.Mass.1982); *Manatee County v. Gorsuch,* 554 F.Supp. 778, 782–83 (M.D. Fla.1982); *Citizens for Mass Transit, Inc. v. Adams,* 492 F.Supp. 304, 312 n. 1 (E.D. La.) *aff'd,* 630 F.2d 309 (5th Cir.1980); *Como-Falcon Coalition, Inc. v. United States Department of Labor,* 465 F.Supp. 850, 856 n. 1 (D.Minn.1978), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *cf. Township of Springfield v. Lewis,* 702 F.2d 426 at 441–42 (3rd Cir.1983) (implicitly adopting this view in affirming the district court's exhaustive analysis of such extra-record evidence). I have already held that "[t]his court will look outside the administrative record [, but] only to the extent absolutely necessary to review agency approval of the extension of I-287 under the relevant standard [of review] discussed [*infra* ] and pursuant to

the applicable statutes and regulations." Transcript of hearing, February 14, 1984 at 38.

In light of my ruling in this regard, I need not dwell at length on the precise contents of the administrative record which can be "very unclear in a NEPA case where there is no formal fact-finding process." *County of Suffolk,* 562 F.2d at 1384 n. 9. As I have already held, "the record should include all relevant studies or data used or published by the agency...." at the very least. *Id.* In short, it should include "all of the documents and materials that were directly or indirectly considered by the decisionmakers at the time the decisions were rendered." *See Lloyd v. Illinois Regional Transportation Authority,* 548 F.Supp. 575, 590 (N.D.Ill.1982).

Judge Biunno ordered defendants to file with the court any documents which plaintiffs had requested be made part of the record but which defendants believed to be outside the proper scope of the administrative record on review. I do not see the necessity of an individual ruling on each such document in this regard. Instead, these documents shall be considered by the court, along with expert affidavits and other extra-record evidence submitted by plaintiffs to the extent that they are probative of defendants' compliance with statutory requirements under the appropriate standard of review discussed *infra.* I turn now to my findings of fact based on a review of this record.

## II. FINDINGS OF FACT [5]

### A. PROCEDURAL HISTORY OF THE I-287 PROJECT.

The National System of Interstate Highways was created by an act of Congress, as set forth in the Federal Aid Highway Act of 1944. The Act provides in part:

There shall be designated within the continental United States a National System

---

**5.** Throughout their proposed findings of fact submitted to this court defendants quote from and refer to a variety of reports and studies which have neither been designated as part of the Administrative Record nor otherwise submitted to plaintiffs or to this court for review.

Defendants may not "have their cake and eat it too" and I will not consider the alleged contents of the reports and studies for purposes of determining defendants compliance or lack of compliance with the governing law.

of Interstate Highways not exceeding forty thousand miles in total extent so located as to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, to serve the national defense, and to connect at suitable border points with routes of continental important in the Dominion of Canada and the Republic of Mexico. The routes of the National System of Interstate Highways shall be selected by joint action of the State highway departments of each State and the adjoining States....

Pub.L. No. 521, § 7, 58 Stat. 842.

Pursuant to the Federal Aid Highway Act of 1944 several state highway departments selected routes for inclusion in the authorized National System of Interstate Highways, and with minor modification to affect interstate continuity, the system was approved by the Federal Works Administrator on August 2, 1947. A.R. Vol. 24, Item 101 (FEIS) at I–14 to 15.[6] It appears that sometime in 1955, several reports and official transmittals were prepared in which the various purposes of the interstate highway system, i.e. to facilitate civil defense and alleviate urban traffic problems, were reiterated. *See* FEIS at I–15. Pursuant to the Federal Aid Highway Act and its purposes, the State Highway Department in New Jersey proposed I–287 on or about March 24, 1955 to the Bureau of Public Roads (BPR) (the predecessor of FHWA). *Id.* at I–15–16. It is undisputed that the following accurately describes the proposed project:

The proposed action consists of the completion of Interstate Route 287 in the northern New Jersey Counties of Morris, Passaic, and Bergen, as well as Rockland County in New York. This project would complete the last gap remaining in the 87-mile circumferential route serving the New York City Metropolitan Area, including northeastern New Jersey (refer to Figure I–1, "Regional Map and Study

Area"). The subject section is approximately 20.6 miles in length and extends from the present terminus of I–287 at U.S. Route 202 in Montville Township, Morris County, to the New York State Thruway (I–87) in Suffern, New York. The proposed highway will consist of three lanes in each direction (six lanes total) separated by a variable width median from Route U.S. 202 in Montville to Colonial Road in Franklin Lakes. From Colonial Road north to an interchange with the New York State Thruway, the highway will consist of two lanes in each direction separated by a variable width median. Access to the road will be fully controlled so that vehicles will be able to enter or exit only at interchange areas. Design of the highway will comply with all appropriate Interstate Highway design standards. [FEIS at ii].

After noting the necessity of the proposed project in a review of the proposal not designated as part of the Administrative Record, on September 15, 1955, BPR approved FAI Route 104, now Route I–287 for inclusion on the national system of interstate highways.

The processing of the I–287 project began in the early 1960's with the identification of three general corridors. Corridor 1, which is identified (in the FEIS) as the westerly alternative (sometimes referred to as the River Route); Corridor 2, which is identified (in the FEIS) as the easterly alternative; and Corridor 3, which is located to the east of Corridor 2. DEIS at 28; FEIS at I–12.

A 1964 location study not designated as part of the Record but provided to the plaintiffs and to the court, recommended the elimination of Corridor 1 because it would not provide sufficient service and could not economically meet geometric design criteria. This study also recommended the elimination of Corridor 3 because of its serious disruption to housing

---

6. This opinion will contain numerous references to the Draft EIS ("DEIS") (A.R. Vol. 3, Item 24); the Preliminary Final EIS ("PFEIS") (A.R. Vol. 15, Item 78A); and the Final EIS ("FEIS")

(A.R. Vol. 14, Item 101). Hereafter, the citations to these documents will present specific page references but will not repeat the Volume and Item number.

and schools due to the more developed area in which it was located and that Corridor 2 be further studied. DEIS at 28; FEIS at I–12.[7]

In 1965 and 1966 Corridor 2 was studied in further detail as presented in the location studies prepared by the engineering firms of Goodkind and O'Dea, Inc. and Howard, Needles, Tammen and Bergendoff, Inc. These studies are not designated by defendants in the Administrative Record. The location report prepared by Goodkind and O'Dea, Inc. reflected a study of proposed I–287 from Main Road, Montville to the Paterson-Hamburg Turnpike. The report prepared by Howard, Needles, Tammen and Bergendoff, Inc. studied the proposed location of I–287 from the Paterson-Hamburg Turnpike to the New Jersey-New York State line in Mahwah. These studies addressed a total of seven major alternatives and recommended the basic easterly alternative. According to the DEIS and FEIS two additional alignment variations of the easterly alternative were then studied in the eastern area of Campgaw Reservation in an effort to reduce parkland takings but were abandoned because of their extraordinary impacts upon residential areas. DEIS at 29–32; FEIS at I–12 and 13.

In 1965–66, a series of three corridor or location hearings were held. In response to the comments at the public hearings, the westerly alternative was further investigated and was the result of a location study prepared by the engineering firm of Howard, Needles, Tammen and Bergendoff, Inc. in 1967. This study presented a cost-benefit analysis which favored the easterly alternative over the westerly. DEIS at 32–33; FEIS at I–13.

On April 19, 1968, the New Jersey Department of Transportation (NJDOT) requested that FHWA approve the easterly alternative. This request came in the form of a letter from Keith Rosser, NJDOT Director of Planning, to Mr. Robert I. Kellum, Division Engineer, FHWA. This letter contained a detailed history of the studies undertaken to date and the reasons for the alignment selection. This request for approval of the easterly alternative was also accompanied by a resolution of the Mayor and Council of the Borough of Oakland (originally one of the plaintiffs in this suit) which strongly recommended approval of the easterly alternative based upon an independent traffic study conducted for the Borough of Oakland by Travers Associates Consultants. A March 18, 1968 letter from Travers Associates to the Borough of Oakland Council accompanied the resolution and indicates that their traffic study reaffirmed NJDOT's findings and supported a recommendation that the construction of I–287 was "most appropriate in relation to the overall regional network—in terms of existing roadways, presently planned roadways and possible and likely future additions to the network." A.R.Vol. 1 Item 1 (April 19, 1968 letter with attachments).[8] On October 29, 1968 the easterly alternative was approved by FHWA as stated in a letter from R.I. Kellum, FHWA, to David J. Goldberg, Commissioner of Transportation. The approval letter also authorized NJDOT to proceed with final design work, A.R.Vol. 1, Item 1, with the understanding that the state would enlist local officials in an overall planning effort. *Id.*

In 1969, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. was passed by Congress. The Act mandated the preparation of an environmental impact statement (EIS) for all major federal actions significantly affecting the environment. *See* my discussion *infra.* NEPA became effective on January 1, 1970. On

---

7. Plaintiffs contend that the location studies rely upon an improper route selection methodology citing to *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). They further contend that the abandonment of certain alternatives was conclusory and improper. *See* discussion *infra.*

8. A.R. Vol. 1, Item 1 also contains a list of the official positions of the communities affected by the I–287 project. At that point in time, plaintiffs Bergen County, Montville Township and Oakland supported the easterly alternative while the Borough of Franklin Lakes supported the westerly or River Route alternative.

August 24, 1971 the FHWA established guidelines for implementing NEPA (Policy and Procedure Memorandum 90–1/Transmittal 202). A.R.Vol. 1, Item 5 at 3. Because the I–287 project had not advanced beyond the design stage, it was determined that it was subject to NEPA's requirements and that the guidelines required the implementation of the EIS process and preparation of an EIS.

In 1972 NJDOT initiated environmental studies associated with the preparation of an EIS. The consulting firms of Howard, Needles, Tammen and Bergendoff as well as Goodkind and O'Dea, Inc. were retained in this regard. A.R. Vol. 1, Items 6 and 7. Defendants and their predecessors were initially disinclined to hold new corridor or location studies as part of the process of reexamination under NEPA. A.R. Vol. 1, Item 9. On August 13, 1973 the Federal-Aid Highway Act was amended, to require the holding of new corridor hearings on the I–287 proposal. A.R. Vol. 1, Item 11. Specifically, the so-called Roe Amendment provides in pertinent part:

> The Secretary of Transportation shall permit no further action on Interstate Route I–287 between Montville and Mahwah, New Jersey, until new corridor hearings are held.

A.R., Vol. 1, Item 11.

As a result of the passage of the Federal-Aid Highway Act of 1973, an analysis of new alternatives was incorporated into the environmental review process and into the preparation of a draft environment impact statement (DEIS). FEIS at I–13; A.R. Vol. 1, Item 12. On April 11, 1974, the environmental consulting firm of S.J. Rosen Associates, Inc. was retained for the purpose of preparing the DEIS, pursuant to FHWA Guidelines for the Implementation of Section 102(2)(c) of the National Environmental Policy Act of 1969; 49 U.S.C. § 1653(f); 16 U.S.C. § 470f; Section 309 of the Clean Air Act of 1970; and 23 U.S.C. § 109(i), including the Section 4(f) requirements of the Department of Transportation Act of 1966 as amended. A.R. Vol. 1, Item 13

(agreement between New Jersey and S.J. Rosen Associates, Inc.).

During preparation of the environmental studies and DEIS, NJDOT met with public and private groups in all municipalities affected by the project, as well as with regional, state, and federal agencies and other groups affected by I–287, to discuss the status of the project, its impacts, and community concerns and suggestions. A.R. Vol. 3, Item 24, at 385, 390–403 and Appendix B; Vol. 1, Items 14–16 (letters received from local governmental agencies including plaintiffs). *See* Vol. 38 (Community Comments and Responses, 1972–1974). The FHWA monitored NJDOT's progress on the DEIS through meetings, correspondence and review of early versions of the document. A.R. Vol. 1, Items 12–18; Vol. 2, Item 22. This monitoring included making general comments on the DEIS/4(f) statement and specifically addressing issues concerning air quality, water quality, noise levels, and construction impacts. A.R. Vol. 2, Item 22. On May 1 and June 13, 1975, NJDOT submitted the required schedules and supporting information to FHWA in compliance with the provisions later codified at 23 C.F.R. § 476.108 (1979) assuring that I–287 will be completed in accordance therewith. A.R. Vol. 32, Item 7.

FHWA certified the Tri-State Regional Planning Commission pursuant to 23 U.S.C. § 134 and the implementing regulations now found at 23 C.F.R. § 450.100 *et seq.* (1982). These provisions require:

> that each urbanized area, as a condition to the receipt of federal capital or operating assistance, have a continuing, cooperative, and comprehensive transportation planning process that results in plans and programs consistent with the comprehensively planned development of the urbanized area. [23 C.F.R. § 450.100. *See* §§ 450.102 and 122].

A.R. Vol. 2, Item 21. In September 1975, the Tri-State Regional Planning Commission[9] (the Metropolitan Planning Organiza-

---

9. The Tri-State Regional Planning Commission terminated operations and its function as the

tion for the Tri-State region pursuant to 23 U.S.C. § 134) issued its regional transportation plan entitled Maintaining Mobility. This plan listed I-287 as a priority project in that it called for early implementation, noting that completion of the circumferential bypass around the metropolitan area would relieve local roads of traffic into and through developing suburban communities. A.R. Vol. 2, Item 23 at 37; FEIS at V-104. No evidence was cited in support of this conclusion and plaintiffs dispute its accuracy citing to technical studies prepared by the EPA and by their own experts.

On September 17, 1975, NJDOT submitted the completed draft environmental impact statement to FHWA for concurrence. The DEIS was approved and signed by John Kessler, Jr., FHWA Division Administrator, on September 26, 1975. A.R. Vol. 3, Item 24. The DEIS was then circulated for public comment on October 1, 1975. *See* FEIS at I-13. On October 6, 1975, FHWA submitted the DEIS to the Council on Environmental Quality (CEQ) for its comments. On October 17, 1975, CEQ published a notice in the Federal Register advising on the DEIS's submission. A.R. Vol. 4, Items 26 and 27.

The draft environmental impact statement consists of two volumes. The first volume contains four hundred (400) pages of analysis and diagrams together with a draft § 4(f) statement and a section containing references. Volume 2 of the DEIS contains four appendices comprised of area maps; correspondence; a tabulation of average daily emissions of air pollutants; and methodology of sound study. A.R. Vol. 3, Item 24. It is not accompanied by independent Technical Studies, instead incorporating such material into the body of the document. *See* A.R. Vol. 3, Item 24; Affidavit of F. Howard Zahn, filed May 10, 1984 at 12. Although the format and contents of the draft environmental impact statement directly track the language of the relevant procedural requirements of § 102(2)(C) of NEPA, 42 U.S.C.

§ 4332(2)(c), plaintiffs strenuously contest the adequacy of the DEIS. *See infra.*

The DEIS describes, *inter alia,* (a) the proposed project and its location (p. 15-23); (b) the need for and history of the project (p. 29-37); (c) existing environmental conditions in the project area (p. 38-104); (d) land use planning (p. 105-114); (e) significant regional environmental impacts (p. 115-160); (f) alternatives and their impacts (p. 161-355); (g) probable adverse environmental impacts which cannot be avoided or reduced to acceptable levels (p. 367-372); (h) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity (p. 373-378); and (i) the irreversible and irretrievable commitments of resources (p. 379-384).

It describes 23 alternatives for the I-287 project, including the "do nothing" alternative. The 22 build alternatives were obtained by combining three basic sets of alternative routes: the easterly alternative, the westerly alternative (both of which include variations of the basic easterly and westerly corridors) and several crossover alternates. The DEIS also documents the consideration and rejection of other alternatives including the use of mass transit, the location of a highway corridor outside the studied corridor, postponement of the proposed action, reconstruction and upgrading of existing facilities, and fifteen (15) alternate alignments considered in the earlier location studies. *See* DEIS at 8-11. The DEIS also includes a draft § 4(f) study, mandated by § 4(f) of the Department of Transportation Act, as amended, 49 U.S.C. § 1653(f) (recodified at 49 U.S.C. § 303) and later restated at 23 U.S.C. § 138, regarding the impact of the various alternatives on park and recreation lands, the existence of prudent and feasible alternatives to the use of such lands, and describing plans to minimize harm to lands for which no prudent and feasible alternative exists. A.R. Vol. 3, Item 24.

regional Metropolitan Planning Organization (MPO) in May, 1982. This occurred as a result

of Connecticut's withdrawal from the Tri-State compact.

On October 16, 1975, a predecessor complaint (Civil Action No. 75–1792) and order to show cause were filed on behalf of the Borough of Franklin Lakes against William T. Coleman, Jr., then Secretary of the USDOT and Allan Sagner, then Commissioner of NJDOT. A.R. Vol. 43, Item 2. The complaint, *inter alia*, sought to enjoin the 1975 public hearings based upon a claim that the hearing format precluded the plaintiffs from participating in the decision-making process. On October 23, 1975, a similar complaint (Civil Action No. 75–1833) and order to show cause for a preliminary injunction were filed by the Township of Wayne against the same defendants as in the Franklin Lakes suit. A.R. Vol. 43, Item 3. These cases were consolidated and dismissed without prejudice pursuant to the opinion and order of Judge Stern as reflected in the November 6, 1975, transcript of proceedings. A.R. Vol. 43, Item 5. Judge Stern's dismissal of the *Borough of Franklin Lakes, et al. v. William T. Coleman, Jr., et al.*, matter was based upon an agreement that the scheduled 1975 public hearings would remain open for at least one week (November 10 through November 14, 1975) during which time the plaintiffs had the right to examine relevant documents and to informally question up to five persons having some relationship to the documents in question. In addition to the rights conferred by Title 23, plaintiffs had the opportunity to make a submission of additional material and expert reports which they deemed relevant to the issues up until ninety (90) days following the close of the public hearing. A.R. Vol. 43, Item 5 at 38. Public information centers were established by NJDOT on November 2, 1975, in Pequannock; on November 5 in Wayne; and on November 6 in Mahwah to provide additional information concerning the project and to inform the public regarding the procedures for making oral and written comments in conjunction with the upcoming public hearings. FEIS at V–7.

Public corridor hearings on the draft EIS were held on November 10 and 14, 1975, at the Indian Hills High School in Oakland, New Jersey, A.R. Vol. 4, Item 28A; Vol. 5, Item 28B (transcript of hearings); Vol. 18, Item 78D (Appendix), pursuant to the requirements of the FAHA. *See* 23 U.S.C. § 128; 23 C.F.R. § 790.3. NJDOT certified to the Federal Highway Administration, in accordance with 23 U.S.C. § 128(a), that the public hearings were held at a convenient location for the purpose of enabling people to express opinions and that NJDOT considered the economic and social effects of the project, its impact on the environment, and its consistency with the goals and objectives of the urban planning of the affected communities. A.R. Vol. 4, Item 28A.

In response to the circulation of the DEIS, numerous comments were submitted by the general public, affected communities, and state and federal agencies. The comments relating to the preferred alternate were later summarized and responded to in the PFEIS at V–8 to 35. The comments and responses were divided into the following categories:

1. Project Need
2. Transportation and Traffic
3. Social Economics
4. Park and Open Spaces
5. Aesthetics
6. Quality of Life
7. Prehistoric and Historic Resources
8. Water Quality
9. Natural Ecosystems
10. Aquatic and Wildlife Resources
11. Noise
12. Air Quality

A comment summary and the responses are reproduced in the FEIS at V–105 to 131. In addition, A.R. Vol. 39 contains correspondence and letters of comment submitted by the affected communities and organizations in response to the draft EIS. A summary of official agency comments as well as a reproduction of the official agency comments and responses thereto are contained in the PFEIS at V–36 to 78 and in the FEIS at V–132 to 174. Comments addressing other alternatives are included in an appendix to the supporting technical

studies. A.R. Vol. 18, Item 78D. The comments regarding the DEIS ranged from complimentary, *see, e.g.*, A.R. Vol. 39 at 76, 77, to highly critical. *See* findings of fact regarding plaintiffs' individual claims *infra*. Plaintiffs contend *inter alia* that defendants' responses to these critical comments were inadequate under governing law. *See* discussion *infra*.

On October 6, 1976, NJDOT Commissioner Alan Sagner advised the Federal Highway Administration that the NJDOT Transportation Planning Board approved a preferred alignment consisting of the alternate 2-westerly-WC crossover-easterly combination as the preferred alignment. Commissioner Sagner stated:

> In making this selection efforts were made to accommodate the recommendations of many citizens and various Federal and State agencies to avoid the significant negative impacts on the Ramapo River.... In making this selection we have avoided the most controversial sections of the eastern and western alignments and therefore selected an alignment which we believe has the least adverse impacts and the least objections. A.R. Vol. 6, Item 35, also found at A.R. Vol. 32, Item 14.

Commissioner Sagner further stated that:

> [A]dditional traffic studies will be comprehensive because many of the criticisms and comments questioned need for the project. With new traffic data we shall weigh very carefully the no-build with the preferred alignment, thus treating in the Final EIS an evaluation between the no-build and the build.
>
> Our evaluation of the no-build will also be carried through the other studies for the Final EIS. This will permit a full identification and disclosure of the impacts associated with building or not building the route. *Id.* at 2. *See also*

A.R. Vol. 28, Item 5 (I-287 Task Force Committee recommendations regarding alignment selection).

On November 23, 1976, John J. Kessler, Jr., FHWA Division Administrator, concurred in NJDOT's plan to proceed with the project for the purpose of advancing the final environmental impact statement. A.R. Vol. 6, Item 35, also found at A.R. Vol. 32, Item 15.

On April 29, 1976, Commissioner Alan Sagner of NJDOT wrote to Governor Brendan T. Byrne requesting de-designation of I-287 and I-95 pursuant to 23 U.S.C. § 103(e)(4).[10] A.R. Vol. 28, Item 3. This letter discusses *inter alia* changed conditions and the limited capital available for state transportation. In urging de-designation of I-287, Commissioner Sagner observed that the strongest argument for the proposed project was "not transportation but economic and of questionable validity." Early in 1976, Governor Byrne determined that I-287 should not be de-designated. Rather, the Governor directed NJDOT to proceed with the completion of an environmental impact statement for I-287 and declared that his administration was committed to the completion of the Interstate Highway System. A.R. Vol. 42, Item 127 (press release dated May 27, 1976).

As set forth in the FEIS, a request to withdraw or de-designate a section of a highway from the Interstate System is addressed to the U.S. Secretary of Transportation. The final decision is within the Secretary's sound discretion. A.R. Vol. 24, Item 101; FEIS at V-13 to V-15. Any such request must demonstrate that the segment is not important for defense purposes, is not essential to a unified system, and will not adversely affect the "connectivity" of the remaining system:

> Clearly, the decision to approve the withdrawal of an Interstate segment is at the

---

**10.** 23 U.S.C. § 103(e)(4) provides in part:

Upon the joint request of a State Governor and the local governments concerned, the Secretary may withdraw his approval of any route or portion thereof on the Interstate System which was selected and approved in accordance with this title, if he determines that

such route or portion thereof is not essential to completion of a unified and connected Interstate System and if he receives assurances that the State does not intend to construct a toll road in the traffic corridor which would be served by the route or portion thereof.

discretion of the U.S. Secretary of Transportation and must be based on an independent evaluation of the segment. Several factors must be considered in a withdrawal request, including whether the segment is important for national defense purposes. Once defense needs are considered, the principal Federal decision in an Interstate withdrawal is the determination that the segment is not essential to a unified and connected Interstate system. This decision is made on the basis of transportation needs.

In addition, another primary concern in an essentiality decision is to assure that the remaining system continues to retain connectivity, and will continue to provide all necessary links for the reasonable movement of people and goods either through or around the area of the withdrawal. *Id.*

As also set forth in the final EIS, it is unlikely that these requisite determinations could be made with regard to the remaining I–287 gap:

> Recent correspondence from the FHWA and from former Secretary of Transportation Goldschmidt indicate that any action to dedesignate this segment of I–287 would not be supported. The proposed project is considered as an important (essential) link in the circumferential routing around the New York Metropolitan area. Further, the Department of Defense has recently reaffirmed the need for I–287's completion. Therefore, only if transportation needs can be satisfied and Interstate system connectivity can be maintained following the withdrawal of a segment of Interstate highway, could it be considered as a non-essential link. Based on this criteria, and in light of supporting traffic studies and a review of the traffic system network, it is considered highly unlikely that I–287 would be considered non-essential if a withdrawal request were made. This would prohibit substitute funding being made available for other transportation projects. *Id.* at FEIS V–14.

*See also* A.R. Vol. 27, Item 119 (letter of Goldschmidt dated February 15, 1980); correspondence from William J. Vichiconti, Mayor of Franklin Lakes to Governor Thomas Kean and Governor Kean's response dated October 28, 1983 (appended to State Defendants Brief in Response to Plaintiff's Compilation of Point Briefs as Exhibits D and E).

Despite the approval of the "easterly alternative prior to the passage of NEPA and the FAHA, in August of 1976, after Governor Byrne had decided not to support de-designation of I–287, NJTPB issued a report recommending that an FEIS be prepared through consultation with the Bureau of Environmental Analysis which would "recommend, select, and be prepared for the 2–westerly-W–C crossover-easterly combination alignment." *See* Vol. 28, Item 5; Vol. 24 at I–13. On October 6, the recommended preferred alignment was forwarded to the FHWA which ultimately concurred on November 23, 1977. *See* A.R. Vol. 33, Item 17.

Studies on the need for completion of the Interstate System, and alternative methods of meeting that need, were made by both the FHWA and NJDOT. In October of 1976, the FHWA published an Interstate Gap Study to provide a uniform method of identifying gaps in the Interstate System as required by Section 102 of the Federal Aid Highway Act. A.R. Vol. 29, Item 11 (attachment). The Study identified gaps in the system and selected as priorities those routes which it found would provide continuity in the "interurban system" while avoiding highly congested areas. *Id.* at pp. 1–2. This study lists I–287 as one of these routes. *Id* at Appendix B, Table 1(a) at B–4. Also in 1976, contemporaneously with Governor Byrne's press release, NJDOT conducted several additional studies concerning the feasibility and desirability of deleting I–287 from the Interstate System. A.R. Vol. 28, Item 4 (Interstate Deletions/Interim Report, March 11, 1976); Vol. 29, Item 11 (Memorandum from Howard Zahn to Commissioner Louis J. Gambaccini regarding feasibility of withdrawing I–287, November 16, 1978); Vol. 29, Item 12 (I–287 Interstate Deletion Report,

November, 1978). These studies noted that there is presently no interstate routing which handles through trips between western New Jersey and the upstate New York area, and that trips between western New Jersey and portions of eastern Pennsylvania to New England can only be made on highly congested routings through New York City and its surrounding urban area. *See* A.R. Vol. 29, Item 11 at 3. They also recognized that the level of local intra-urban service is currently inadequate. Finally, the studies determined that "[w]hile I–287 will not facilitate all of the intrauarban trips in the corridor, it will significantly improve the level of intrauarban service." *Id.* at 4. *See also* the I–287 Interstate Deletion Report which describes the congestion of routes along the I–287 corridor and the difficulties associated with upgrading those routes. A.R. Vol. 29, Item 12. Plaintiffs, of course, contest these conclusions. *See* discussion *infra.*

In its November 1976 issue of *Maintaining Mobility*, the Tri-State Regional Planning Commission again called I–287 a priority project and called for its early implementation. A.R. Vol. 6, Item 34 at 43.

Work on the final EIS/4(f) was initiated in 1977. The engineering and environmental consulting firm of Louis Berger and Associates, Inc. was retained on April 18, 1977 to do the following:

(a) undertake technical studies;

(b) prepare technical support documents;

(c) prepare the final EIS:

(d) prepare a 4(f) statement;

(e) review all of the comments to the DEIS:

(f) participate in a community involvement program; and

(g) participate in status and data collection meetings as set forth in the agreement entered into between the Commissioner of Transportation and Lewis Bergen and Associates, Inc.

The agreement required that the technical reports associated with this project include:

(a) a social economic study;

(b) a water resources and ecology study;

(c) traffic studies;

(d) a mass transit alternative study;

(e) an energy consumption analysis;

(f) a construction impacts analysis;

(g) an archaeological/historic site study.

A.R. Vol. 6, Item 37. *See* A.R. Vol. 6, Item 36 (press release).

Beginning in 1977 and continuing through 1978, Public Information Centers were established throughout the area to be affected by proposed I–287. These centers constituted part of the continued community involvement program. A.R. Vol. 33, Items 16 and 17; FEIS at V–7.

In April of 1978, Congressman Robert Roe publicly proposed an alignment which was different from those alternatives presented in the DEIS. This alignment was to the west of portions of the then preferred alternative. This alignment was developed in consultation with "mayors, councilmen, freeholders, Congressional representatives and other public officials ... in the northern part of the State of New Jersey." A.R. Vol. 28, Item 7 (Congressman Roe's press release attached to NJDOT's Environmental Assessment of I–287A); A.R. Vol. 24, Item 101, FEIS at I–13; Vol. 7, Item 43. The communities of Mahwah, Oakland, Wanaque, Bloomingdale, Pequannock, Franklin Lakes and Pompton Lakes supported the Roe Alignment. PFEIS at V–5 and 6.

The "Roe Alignment" was presented to defendants for consideration approximately two years after the close of the public comment period, as extended by Judge Stern, following the November 1975 public hearings. *Id.; see also* A.R. Vol. 4, Item 25; A.R. Vol. 43, Item 5 at 38. On April 14, 1978 NJDOT completed preliminary environment assessment of the alternative proposed by Congressman Roe, also known as I–287A. The assessment noted that I–287A is a westerly alignment which shifts the route of the roadway into the mountains and away from developed areas. The study reported that the northern section of I–287A would require a massive taking of·

parkland, and the southern and middle sections of the alternate would increase the impacts associated with woodlands and wildlife habitat. The assessment recommended that further engineering studies be undertaken to determine the feasibility and costs of building the I–287A alternate. A.R. Vol. 28, Item 7. On May 5, 1978 NJDOT completed a design analysis, or engineering assessment, of the Roe alignment for that portion of the alternate from Montville to Lake Inez, or the southern half of the proposed route. This preliminary study noted that the suggested alternate would require an excessive amount of climbing lanes and would also require that two 3,000 foot long tunnels be bored, at an additional cost of $20 million, all due to the topograph of I–287A. The study concluded that maintenance costs for these tunnels would be approximately $350,000 per year, over and above normal maintenance costs. A.R. Vol. 28, Item 8. On May 25, 1978, FHWA requested that NJDOT submit a "method of analysis" of the Roe Alignment. A.R. Vol. 32, Item 17.

On May 31, 1978 in Mahwah, and on June 20, 1978 in Lincoln Park, NJDOT conducted two public informational hearings to update the public on the status of NJDOT's technical studies, and to solicit comments regarding NJDOT's preferred alignment of I–287 and the Roe Alternative. The overwhelming response was in favor of the Roe Alternative. Those speakers favoring the Roe Alignment asserted that I–287A was preferable because it was developed in concert with the affected municipalities, impacted less severely upon residential and commercial areas than the preferred alignment, was the most westerly alignment and traversed more open space, as opposed to taking people's homes, and had less of an impact upon potable water resources. Conversely, those speakers favoring the preferred alignment asserted that I–287A would be destructive, costly and unnecessary. Specifically, these speakers maintained that I–287A would take or threaten 20 to 30 residences along Jacksonville Road, that the proposed tunnel would be too costly and environmentally disasterous,

that construction costs for I–287A are four times greater than the preferred alignment, and that I–287A would require a longer construction period causing greater inconvenience to residents, and resulting in inflationary costs. A.R. Vol. 33, Item 22.

On or about July 13, 1978, pursuant to the Natural Areas System Act, N.J.S.A. 13:1B–15.12a et seq., the New Jersey Department of Environmental Protection (NJDEP) included within the Natural State Forest an area known as the Ramapo Lake natural area. N.J.A.C. 7:2–11.22(b)7, 10 N.J.R. 328(d). This area was designated to permit recreation activities appropriate to the area and is bounded on the north by Skyline Drive, on the east and west by the limits of the forest, and on the south by the I–287 right of way of the Department of Transportation. Pursuant to the Natural Areas System Act, "no land in the system may be leased, sold or exchanged or be taken by any corporation, public or private, nor shall timber thereon be sold, removed or destroyed, nor minerals extracted, except by authorizing special legislation." N.J.S.A. 13:1B–15.12a7. The proposed route of the Roe Alignment was to pass directly through this designated natural system area. A.R. Vol. 33, Item 26. However no special legislation authorizing the acquisition of this land was ever enacted by the New Jersey state legislature.

On August 30, 1978 NJDEP Commissioner Daniel J. O'Hern advised NJDOT Commissioner Gambaccini of NJDEP's opinion of the environmental impacts of the northern section of the Roe Alignment, and the westerly alternative north of the Wanaque River crossing (also known as the River route). A.R. Vol. 34, Item 38. Commissioner O'Hern stated that NJDEP had not to this point supported any particular alignment, but had gone on record in opposition to the River Route along the Ramapo River valley. He further advised NJDOT that on a "conceptual basis," NJDEP favors a corridor which would utilize the W–C crossover from the westerly alternative on the south to the easterly alternative on the north, consistent with NJDOT's preferred

alignment. Noting that the DEIS had failed to provide the necessary specifics, Commissioner O'Hern indicated that a formal position would be forthcoming upon a review of the final environmental impact statement. *Id.* Moreover, Commissioner O'Hern "emphatically" objected to any alignment which would significantly encroach upon the Ramapo mountain wilderness, and noted the "unique and irreplaceable resources" of the skyland's region and that DEP had set about acquiring lands under the mandate of the State's Green Acres Program. *Id. See* Natural Areas System Act, N.J.S.A. 13:1B–15.12a, *et seq.*

Commissioner O'Hern also noted that in addition to the parkland issues raised by the Roe Alignment, serious environmental consequences would occur if the highway were to be constructed along the Ramapo ridges. The Commissioner noted the following among the potential adverse environmental impacts:

 (a) the destruction of trout production streams at their headwaters;

 (b) the disruption to wildlife habitat by severing wildlife migration corridors;

 (c) the worsening of Ramapo River flooding problems;

 (d) the destruction of the sense of peace and serenity in the wilderness through the introduction of highway noise;

 (e) the inducement of undesirable secondary development within an environmentally sensitive region.

Therefore, O'Hern concluded, in light of these effects, and Section 4(f) of the Department of Transportation Act:

The Roe alignment would appear to run counter to the national policy. In fact, it would be most difficult for you or the Federal Highway Administration to support the Roe alignment in the face of the Section 4(f) guiding statement that park-lands shall be avoided unless ... "there is no feasible and prudent alternative to the use of such lands." Your own studies indicate that such alternatives do exist.

In conclusion, I would urge you to seek alternatives to both the Roe alignment and the River Route in that the likelihood that you would be able to obtain the necessary approvals to acquire a right-of-way through the public parkland is, in my judgment, nonexistent. *Id.,* at page 2.

On August 16, 1978, NJDOT Commissioner Gambaccini advised Congressman Robert Roe that NJDOT would request an extension of time within which to file an FEIS, in order that the Roe Alignment may be more fully addressed. A.R. Vol. 32, Item 10. On or about August 17, 1978, NJDOT's Commissioner Louis J. Gambaccini requested of FHWA an extension of time from the October 1, 1978 deadline[11] for the submission of the FEIS/4(f) Statement. On August 23, in response to this request, FHWA notified NJDOT that:

[I]t is consistent with Federal Highway Administration (FHWA) policy to submit a final environmental impact statement (EIS) more than 3 years after the draft EIS was circulated, provided however the proposal is substantially similar to route alignments presented as alternatives in the draft EIS and provided the impacts are not significantly different than those identified in the draft.

If the New Jersey Department of Transportation (DOT) concludes that the above conditions exist, the final EIS may be completed and submitted to FHW on or about February 1, 1979, as proposed in your letter. If FHWA agrees with the Department's determination and the final EIS is otherwise satisfactory, it will be processed in accordance with normal procedures. If FHWA does not agree, it

---

**11.** The Federal Regulations in effect at this time provided:

 The draft EIS shall, if necessary, be revised unless the final EIS is submitted to FHWA for adoption within 3 years from the date the draft EIS was circulated. 23 CFR § 771.12(*o*)

(1980); *see also* 23 CFR 661,129(c)(1) (1981). Moreover the New Jersey Action Plan requires new corridor hearings under these and other circumstances. *See* discussion *infra;* A.R. Vol. 2, Item 20 at VII–27.

will be necessary to revise or supplement the draft EIS.

A.R. Vol. 32, Item 19.

Nevertheless, NJDOT submitted a document purporting to be a FEIS/4(f) Statement on the project to FHWA on September 29, 1978, just one day short of 3 years following the circulation of the DEIS/4(f) Statement. A.R. Vol. 32, Item 20. However, NJDOT further informed FHWA that it was undertaking an evaluation of the Roe Alignment and that it would submit this evaluation on or about February 1, 1979. A.R. Vol. 32, Item 20; Vol. 28, Item 9. Between September 29, 1978 and October 5, 1978 NJDOT and FHWA concluded that consideration of the Roe Alignment (I–287A) should be in the FEIS as opposed to a supplement. *See* findings of fact of Judge Lacey in prior proceedings dated December 15, 1980 at A.R. Vol. 43, Item 11 at 4. For this reason, John J. Kessler, FHWA Division Administrator, returned the FEIS to NJDOT by cover letter dated October 5, 1978. This letter stated:

> Your September 29 letter transmitting the Environmental Impact Statement for I–287 states that the Department is currently evaluating the alternate alignment suggested by Congressman Roe (I–287A) and will make a final decision on the location upon completion of the evaluation.
>
> We believe that the alignment recommended in the EIS should present the final decision on location. Accordingly the EIS is hereby returned. We suggest that it be resubmitted when the evaluation of alignment I–287A has been completed and a final decision can be made.

A.R. Vol. 32, Item 21.

Beginning in October 1978, NJDOT engaged in an indepth review and an analysis of the Roe Alignment. Specifically, NJDOT prepared a study of the impact of the Roe Alignment on parklands, A.R. Vol. 34, Item 49, and other environmental sites, A.R. Vol. 34, Items 48 and 51, and Vol. 32, Item 22. Moreover, NJDOT engaged in a study to analyze the Roe Alignment from its engineering, social and economic aspects, to be included in the FEIS. A.R. Vol. 33, Item 33. In November 1978, prior to the submission of a final environmental impact statement, NJDOT conducted a further investigation into the feasibility and desirability of designating I–287. A.R. Vol. 33, Items 34, 35 and 36; A.R. Vol. 29, Items 11 and 12.

On January 19, 1979, NJDOT issued its analysis of the Roe Alignment, I–287A. This study concluded that I–287A was not a reasonable alternative due to the proposal's severe environmental impacts, high costs, extremely difficult construction problems and resultant unacceptable driving conditions. A.R. Vol. 7, Item 43. In releasing this study, NJDOT Commissioner Gambaccini noted that I–287A would cost an estimated $802 million at the time of construction, approximately $340 million more than NJDOT's preferred alignment.

The analysis determined that I–287A would pass through five state and county parks for a total distance of 4 miles, taking approximately 116 acres of parkland for right of way and destroying approximately 700 acres of productive and ecologically valuable vegetation in a largely undisturbed wilderness area. The study concluded that construction in mountainous terrain, as proposed by the Roe Alignment, would require the moving of between 17 and 18 million cubic yards of material, which would represent the largest earth work operation in the history of the Department, and alone would cost more than $160 million. Further, due to this mountainous terrain, the roadway would need to be constructed at a 4 to 5 percent grade, creating serious driving hazards. Such construction would also leave a permanent and visible scar across the face of the Ramapo mountains. The NJDOT analysis concluded that completion of the I–287A alignment would take five years longer than NJDOT's preferred alignment, would add substantially to construction costs, and would extend the project beyond the federally mandated deadline for interstate construction starts of 1986, thereby jeopardizing federal funding for the project.

Consequently, NJDOT determined that I–287A "produces unwarranted costs, unacceptable design, unnecessary acquisition of parklands and other severe ecological and aesthetic impacts, as well as highly undesirable maintenance and operational problems." As such, the Roe Alignment was found not to be a prudent, feasible or reasonable alternative for the location of I–287. A.R. Vol. 7, Item 43; A.R. Vol. 29, Item 14.

On February 1, 1979 NJDOT submitted another FEIS containing a section addressing the "Roe Alignment," to FHWA. A.R. Vol. 32, Item 27. This submission occurred within three years of the close of the record relating to the 1975 public hearings but more than three years after circulation of the DEIS, and represented the culmination of 10 years of study on the completion of I–287. The process considered 22 alternative routes plus 15 additional variations of those routes and 41 public meetings or hearings. A.R. Vol. 8, Item 44A; Vol. 32, Item 27. Accompanying the FEIS were 11 volumes of technical studies. A.R.Vols. 8 and 9. FHWA accepted, but did not approve the newly submitted FEIS/4(f) Statement.

The 1979 technical support studies address the following issues:

*Volume 1*—addresses the issues raised by the transportation (Traffic) planning study for the preferred alternative. This included consideration of current usage and problems of the highway network, a network simulation study, a review of base year travel and design year travel forecasts, and the consideration of traffic assignments, future projections without the project and future projections with the project.

*Volume 2*—consists of a study of mass transit alternatives, and includes a review of existing mass transit service, public transit demand, and the impact of proposed route I–287 on public transportation.

*Volume 3*—studies socio-economics and includes a regional profile, a study of baseline population, employment and land use projections, employment and land use impacts, as well as local socio-economic impacts.

*Volume 4*—consists of a study of the aesthetics from a users view, a nonusers view, the horizontal and vertical alignment of the roadway and in conjunction with historic resources.

*Volume 5*—contains a study of prehistoric archaeology and reviews the geology and natural environment. The study includes an archaeological survey, a pedestrian archaeological survey and a study of the prehistoric archaeological resources in the vicinity of proposed interchanges and relocations.

*Volume 6*—consists of a study of the historic archaeology and includes a study of particular sites which may warrant consideration for inclusion on the State and National registers.

*Volume 7*—entails a study of historic architecture and embodies an analysis of individual structures and sites which warrant consideration for inclusion on the State and National Registers.

*Volume 8*—studies land and water resources, including existing conditions, projected impacts, a summary of impacts, and a study of mitigating measures. This study of the projected impacts considers the cut and fill areas, and studies erosion and sedimentation, hydrological/hydraulic impacts, surface water quality impacts, impacts to ground water quality, and water resources and waste water management plans.

*Volume 9*—considers the nature ecosystems including existing conditions, projected impacts and mitigating measures.

*Volume 10*—is a study of air quality on a microscale and mesoscale, completed by reference to mathematical modeling, model input data, emission factors, mesoscale analysis, background air quality and a prediction of future background levels.

*Volume 11*—is a study of noise, including existing noise, predicted noise, the impacts of noise and the abatement of noise. A.R.Vols. 8 and 9.

During the succeeding year and a half following the February 1, 1979 submission of the FEIS by NJDOT to FHWA, the FHWA reviewed the document and the technical support studies. NJDOT prepared additional studies and materials in response to FHWA's comments and coordinated its research and reports with state and federal commenting agencies. A.R. Vol. 10, Items 45–53; A.R. Vol. 11, Item 59; A.R. Vol. 32, Items 31–36; A.R. Vol. 33, Items 42–62, 66–73; A.R. Vol. 13, Item 72; A.R. Vol. 14, Items 75, 76; A.R. Vol. 34, Items 55–95; A.R. Vol. 35, Items 96–123, 129, 130, 133–142. Among others, this review process included coordination with (a) the Department of Housing and Urban Development, A.R. Vol. 34, Item 69; A.R. Vol. 35, Item 119; (b) the Department of the Army, A.R. Vol. 10, Items 48–51; (c) the Fish and Wildlife Service, A.R. Vol. 10, Item 49; (d) the Department of the Interior, A.R. Vol. 32, Item 33; (e) the New York State Department of Transportation, A.R. Vol. 33, Item 49; A.R. Vol. 34, Items 55, 74 and 84; (f) the Tri-State Regional Planning Commission, A.R. Vol. 33, Item 51; A.R. Vol. 34, Items 63, 68 and 89; (g) the New Jersey Department of Environmental Protection, A.R. Vol. 34, Items 60, 62. This analysis also included, *inter alia,* a review of the asserted defense needs for I–287, A.R. Vol. 10, Item 51, wetlands impacts, A.R. Vol. 33, Items 46, 47, 53, 54, 56 and 62, traffic impacts, A.R. Vol. 34, Item 55, the effect on historic properties, A.R. Vol. 34, Items 56, 57 and air quality A.R. Vol. 34, Items 58, 60 and 62.

On January 25, 1980, Pequannock, Franklin Lakes and Mahwah, through their counsel, the firm of Winer, Neuberger and Sive, wrote to John J. Kessler, Jr., FHWA Division Administrator, formally requesting a redraft and recirculation of the DEIS. A.R. Vol. 27, Item 119 (also appearing without attachment in A.R. Vol. 41, Item 31). On February 25, 1980, John J. Kessler, Jr., FHWA Division Administrator, advised counsel for Pequannock, Franklin Lakes and Mahwah, that this issue was being debated and a decision on its request to redraft and recirculate the environmental impact statement was being considered. A.R. Vol. 27, Item 119. On June 6, 1980, Andrew McGuire, the County of Bergen, the Township of Pequannock, the Borough of Franklin Lakes, the Township of Mahwah, the Borough of Pompton Lakes, the Borough of Oakland and the Borough of Riverdale filed a complaint in the United States District Court for the District of New Jersey (Civil Action No. 80–1640), requesting the court to enjoin the further processing of the I–287 project. A.R. Vol. 43, Item 10. In short, throughout early 1980, NJDOT and FHWA considered the necessity or desirability of preparing and circulating a supplement to the environmental impact statement. A.R. Vol. 32, Items 38–41.

On June 20 and June 26, 1980, FHWA officials recommended that a written assessment of outstanding environmental issues regarding I–287 be prepared by NJDOT. Moreover, FHWA further suggested that a "task force" be created to identify and clarify pending issues and expedite the completion of the environmental review process. Further, the task force was to consider the necessity of redrafting the DEIS and of holding new corridor hearings. *See infra.* Pursuant to FHWA's suggestion, a task force was organized to address those issues raised in the environmental review process. The task force was comprised of officials from USDOT, FHWA, NJDOT, NYSDOT, and the New York Thruway Authority and met on August 8, September 9, October 14, and November 10, 1980. The Tri-State Regional Planning Commission was invited to attend the meetings. Minutes of these meetings are contained in the Administrative Record at Vol. 10, Item 58.

On December 15, 1980, Judge Lacey dismissed, without prejudice, *Andrew McGuire v. Neil E. Goldschmidt, et al.,* (Civil No. 80–1640); wherein plaintiffs sought to enjoin the further processing of the I–287 project. A.R. Vol. 43, Item 10 (Memorandum Opinion).

On or about December 22, 1980, and in conjunction with the efforts of the Task

Force, NJDOT prepared an Environmental Assessment (EA) to evaluate and address those issues which have arisen since the preparation and circulation of the DEIS, and to determine whether a new or supplemental DEIS was necessary. Specifically, NJDOT sought to determine whether:

(1) substantial changes have occurred in the proposed action that will have a significant environmental effect; or

(2) significant new information regarding the action's environmental aspects has been available. A.R. Vol. 31, Item 28 at 2.

Consequently the EA addressed the following issues, and analyzed any changes in those issues since consideration in the DEIS:

(1) impact upon wetlands;

(2) alternative routes considered;

(3) impact upon historic and archaeological sites;

(4) design features;

(5) impacts in New York State;

(6) need for the project;

(7) energy impacts;

(8) community impacts;

(9) Section 4(f) impacts;

(10) disposal of waste material and borrow sites;

(11) air quality; and

(12) water supply.

*Id.* also found at A.R. Vol. 12, Item 67. As a result of this analysis, the EA concluded that there was no one issue or accumulation of issues which would require, under the applicable laws and regulations, that the DEIS be supplemented or that another public hearing be held. *Id.* at 34. NJDOT's Environmental Assessment was transmitted to FHWA on December 22, 1980. A.R. Vol. 32, Item 49. A revised cost estimate was provided on February 10, 1981. *Id.* at Item 50.

Contemporaneously with its determination that no need existed for a supplemental DEIS, as set forth in the Environmental Assessment, NJDOT nevertheless proposed that an environmental analysis report be circulated and that some form of public hearing be conducted. A.R. Vol. 31, Item 28 at 34.

As noted by the Office of Environmental Policy of the FHWA:

The assessment compared conditions at the time the task force was operative to those discussed in the draft EIS to determine if any single issue or accumulative changes warranted a supplement or new environment statement. On December 22, 1980 the New Jersey DOT presented the I–287 assessment of issues to FHWA for approval. This assessment concluded that there was no issue or accumulation of issues of such significance to require a new EIS or a supplement to the original draft EIS. There was strong opinions among the task force members on both sides concerning the need for a supplement EIS. The New Jersey DOT did, however, recognize the importance of the issues to the public and the controversy surrounding the project. Because of this intense public interest, the New Jersey DOT proposed to circulate for comment an environmental analysis report (later to become titled as a preliminary final EIS), to hold an additional informational public hearing, and to prepare a final EIS for submission to FHWA. The primary purposes of these actions were to update the public on the status of the project, to solicit views on the State's preferred alternative, and to assure that current environmental information was available to the public before any final action would be taken on this project.

Decision Statement, A.R. Vol. 25, Item 106 at 2 (also found at Vol. 32, Item 82).

Upon initial review, the conclusion of the EA that neither a supplemental DEIS nor additional public hearings were necessary was rejected by officials at FHWA. *See* A.R. Vol. 12, Item 68, Letter of John Kessler, Division Administrator, Trenton, New Jersey to J.M. O'Connor, Associate Administrator for Right of Way and Environment, Washington, D.C., dated January 8, 1981; *id.,* Letter of John Bestgen, Deputy Regional Administrator, Albany, New York, to Mr. O'Connor dated January 13,

1981; *id.* Letter of R.A. Barnhart, Federal Highway Administrator to Mr. Bestgen dated February 13, 1981. Finally by letter dated February 19, 1981, Mr. Kessler advised Mr. Harf, Acting Director of Transportation Planning and Research, NJDOT, that:

> FHWA's review has been concluded and we find that the recommendation contained in your assessment report to proceed with the preparation of the final EIS without supplementing the draft EIS is not acceptable. Accordingly, be advised that a supplement to the draft environmental impact statement must be prepared and circulated to the public and appropriate review agencies for review and comment. This supplement should address the significant information on the projects' impact on the human environment which has become evident since the circulation of the draft EIS as well as any substantive changes that occurred in the proposed action. In addition ... an additional public hearing must be held prior to the adoption of the final EIS.

A.R. Vol. 12, Item 69.

NJDOT Commissioner Gambaccini subsequently appealed Mr. Barnhart's decision and after meeting with FHWA personnel, "persuaded FHWA that New Jersey's recommendation to prepare and circulate for comment the environmental analysis report under the cover of a preliminary final EIS would satisfy the National Environmental Policy Act requirements and would serve the State's purposes at the same time, *i.e.,* to update the public on the project and its impacts and solicit comments." A.R. Vol. 32, Item 82 at pp. 2–3 (FHWA Decision Statement). FHWA thus reversed its position and concurred with NJDOT's conclusion that a supplement to the DEIS did not have to be prepared and that a new corridor hearing was not required. A.R. Vol. 12, Item 71. This decision was communicated to Mr. Bestgen by L.P. Lamm, Executive Director of FHWA by letter dated February 25, 1981. Mr. Lamm explained the abrupt reversal as follows:

> The decision was based on the overwhelming need and desire to advance this project within the shortest possible period of time, consistent with all the applicable requirements. Mr. Gambaccini and the FHWA personnel recognize that the final EIS must fully address the changes that have occurred since the circulation of the draft EIS.

*Id.*

FHWA transmitted this decision to NJDOT in a March 13, 1981 letter from the Division Administrator. A.R. Vol. 12, Item 71, also found at Vol. 32, Item 52. *See* A.R. Vol. 32, Item 82 (FHWA Decision Statement) also found at Vol. 25, Item 106. Nevertheless, NJDOT and FHWA agreed as per earlier suggestions, to circulate an environmental analysis report which assessed changes in the project and information developed subsequent to the 1975 hearings, conduct an additional public hearing, and respond to any comments received prior to finalizing the EIS. This environmental analysis report eventually became known as the PFEIS.

On May 8, 1981 John J. Kessler, Jr., FHWA Division Administrator and Louis J. Gambaccini, Commissioner of Transportation, formally disbanded the I–287 Task Force. A.R. Vol. 14, Item 73. On May 23, 1981 F. Howard Zahn, then Chief of the Bureau of Environmental Analysis, NJDOT, notified federal commenting agencies of the results of the I–287 Task Force and of the concomitant decisions related to the circulation of a PFEIS and the holding of an additional public hearing. This letter was transmitted to USEPA; Region 5, Fish and Wildlife Service, USDOI; HUD; Office of Environmental Review, USDOI; and the Department of the Army. A.R. Vol. 35, Items 124–128, 131, also found at A.R. Vol. 14, Item 74.

In June 1981 the Tri-State Regional Planning Commission again issued its Regional Transportation Plan entitled *Maintaining Mobility.* The plan identified systems and specific proposals that would help to achieve regional planning objectives. The plan listed I–287 as a priority project. A.R. Vol. 19, Item 82 at 58.

On August 31, 1981, the PFEIS with draft section 4(f) evaluation for Interstate Route 287, and the 1981 technical studies for the preferred alternative, were transmitted by NJDOT to the Federal Highway Administration. A.R. Vol. 15, Item 78A; A.R. Vol. 16, Item 78B; A.R. Vol. 17, Item 78C; A.R. Vol. 18, Item 78D. On September 1, 1981 the PFEIS with draft 4(f) statement was circulated to the public and to all commenting agencies to the same extent as any environmental impact statement. A.R. Vol. 19, Item 80; A.R. Vol. 32, Item 66. The PFEIS contained updated information developed since the DEIS was circulated. On September 11, 1981, the EPA published notification of the availability of the PFEIS/draft 4(f) document. 46 Fed.Reg. 45411; A.R. Vol. 19, Item 81. Press releases were issued by the New Jersey Department of Transportation on September 9 and September 24, 1981 which provided information concerning the availability of the PFEIS and advising the public that hearings were to be held at the Pompton Lakes High School Auditorium on October 5, 6 and 7, 1981. A.R. Vol. 19, Item 81; A.R. Vol. 32, Item 72. A.R. Vol. 19, Item 83.

On September 29, 1981 the firm of Winer, Neuberger and Sive, P.C., on behalf of the Township of Pequannock, Franklin Lakes and Mahwah, wrote to the Federal Highway Administration's Chief Counsel asking for an explanation of the term "preliminary final" EIS and "how the document will be treated or processed with respect to the applicable regulations." A.R. Vol. 41, Item 131, also found at A.R. Vol. 27, Item 119. Donald L. Ivers, FHWA's Chief Counsel, responded to the above inquiry by letter dated October 29, 1981. His letter explains:

The preliminary final environmental impact statement on the project which is now being circulated for comment is not required by any regulations. It was prepared to keep the public and appropriate agencies informed regarding this project. To accomplish this, the Federal Highway Administration proposes to process it in approximately the same manner as a draft environment impact statement.

A.R. Vol. 42, Item 133. *See* A.R. Vol. 25, Item 106 (Decision Statement at 3 which provides that "this document was processed in the same manner as a supplemental EIS"). The format and content of the PFEIS directly track the language of NEPA as set forth in 42 U.S.C. § 4332(2)(C). Specifically, the PFEIS contains:

(a) a project description including its history, location, basis for implementing the proposal (need), and a description of existing conditions;

(b) environmental impacts common to all alternatives;

(c) alternatives and their impacts which includes a discussion of alternatives considered and discarded prior to and during the development of the draft EIS;

(d) impacts of the preferred alternative (including a wetlands and flood plain finding);

(e) impacts within New York State;

(f) probable adverse impacts which cannot be avoided;

(g) the relationship between short-term uses of the environment and maintenance of long-term productivity;

(h) irreversible and irretrievable resource commitments;

A.R. Vol. 15, Item 78A; Vols. 16–18 (Technical Support Studies).

The PFEIS identified as the preferred alternative a different alternative than that identified by the NJTPB in 1976; that is, the PFEIS adopted alternative 1–Westerly–WC Crossover–Easterly combination. This varied from the alignment previously preferred to the extent that Alternative 1 in the south was now preferable to Alternate 2. Both Alternate 1 and Alternate 2 were presented in the DEIS. This change in preference is attributable to the fact that Alternate 1 avoids the serious impact upon wetlands (the Bog and Vly Meadows) incurred by Alternate 2. The change also avoids Rockledge Park. FEIS at III–28–30; *see* A.R. Vol. 31, Item 28 at 1–4 (Envi-

ronmental Assessment); A.R.Vols. 16–18 (Supplemental Studies for the Preferred Alternative contained in Volumes 3–11 of the 1981 Technical Studies). The PFEIS was accompanied by eleven volumes of "Technical Studies for the Preferred Alternative" ("Technical Studies"). These Technical Studies were updates of studies that had been originally prepared and submitted to FHWA by NJDOT with the FEIS 4(f) Statement that was submitted to and rejected by FHWA in 1978. *See* A.R.Vols. 15–18.

The public hearings were held on October 5, 6, 7 and 20, 1981. The first three hearing dates reflect hearings held in New Jersey while the hearing on October 20 was held in New York. A.R. Vol. 19, Item 83, 84A; Vol. 20, Item 84B (hearing transcripts). In discussing the nature of the upcoming hearings, it is clear that some officials wished "to avoid the possibility of project opponents seeking to reopen issues considered at the 1975 hearing", particularly the reopening and consideration of alternatives previously rejected. It was therefore suggested that an "informational hearing" be substituted for a new corridor hearing on the PFEIS/4(f) Statement. Memorandum of Martin Convisser, dated February 19, 1981, Fed.Defs. Appendix, Item 2; *see* "I–287 Position Paper" authored by New Jersey State Attorney General's Office, A.R. Vol. 12, Item 66 at 3–6. The Regional Design Engineer of NJDOT emphatically maintained the "time for alignment selection is past . . . ." A.R. Vol. 23, Item 90. The principal reason for refusing to hold a new corridor hearing, as stated by the New Jersey Attorney General's Office, was that such a hearing would take "the project back five years in time. Opponents of the project would now not only be free to but would be invited to submit alternatives to the preferred line." A.R. Vol. 12, Item 66 at 6. Committed to the preferred route alignment, NJDOT did not want to hold a new corridor hearing, which by law had to precede any commitment to a specific route alignment. Plaintiffs contend that the most critical failing of these "informational hearings" was the alleged refusal of NJDOT and FHWA to consider issues which they regarded as foreclosed because of the 1975 corridor hearing. *See* discussion *infra.*

Following the 1981 public hearings, NJDOT and FHWA undertook a review of the issues raised at the public hearings and in letters submitted during the comment period. This review process culminated in the preparation of responses to these comments as set forth in the FEIS, and NJDOT's decision to ask for location approval of the preferred alternative. The aforesaid comments touched upon a number of issues including:

1. the project's impact on New York State;

2. noise;

3. historic sites;

4. air quality;

5. socio-economics;

6. traffic;

7. relocation questions;

8. need;

9. the impact of the project upon parklands.

A.R. Vol. 23, Item 89–94; A.R. Vol. 33, Items 74–92; *see* FEIS at V–8 to 104 (responses to preliminary final EIS, public hearing comments, official agency comments, and attachments).

On or about April 15, 1982, NJDOT approved a FEIS/4(f) Statement for the project the text of which was in part identical to the text of portions of the PFEIS. On April 29, 1982, NJDOT transmitted 25 advanced copies of the FEIS/4(f) statement to FHHA (with the exception of the Section III summary/matrix of impacts). A.R. Vol. 23, Item 99 (also contained at Vol. 32, Item 78). On July 7, 1982, NJDOT transmitted the Section III summary/matrix and errata sheet to FHWA, completing the submission of the FEIS/4(f) statement for approval. The transmittal formally rerequested approval and adoption of the document as well as location approval of the preferred alternative as described in the FEIS/4(f).

A.R. Vol. 25, Item 102 (also found at Vol. 32, Item 79).

The preferred alternative, as summarily described in the FEIS/4(f) Statement, takes the following route:

*Description of the Preferred Alternative*

The Preferred Alternative for the completion of I–287 consists of the following combination of alternatives studied in the Draft EIS/4(f): the southern portion of the Westerly with Westerly Alternative 1, the W–C Crossover, and the northerly portion of the Easterly.... The Preferred Alternative begins at I–287's present terminus in Montville (an interchange with U.S. 202). The proposed six-lane facility curves north, ascends the Waughaw Mountains and enters Kinnelon. The alignment then curves gently to the east and traverses the western boundary of Morris County's Sunset Valley Golf Course before entering Pequannock. The alignment then proceeds to the north interchanging with Route 23 and Paterson-Hamburg Turnpike in Riverdale. The alignment then enters Bloomingdale. After crossing New York, Susquehanna and Western Railroad, the facility curves to the east across the Erie-Lackawanna Railroad and the northwest corner of Pompton Lakes. The alignment continues east into Wanaque, interchanging with Ringwood Avenue and crossing Lake Inez into Oakland in Bergen County. The alignment interchanges with Skyline Drive and then combines with existing route 208 for a distance of slightly more than a mile before turning north along the western side of Colonial Avenue in Franklin Lakes. The route then becomes a four lane highway after diverging from Route 208 and proceeds north into Mahwah interchanging with Route 202, crossing the Ramapo River and then paralleling and merging with New Jersey Route 17 to an interchange with I–87 (New York State Thruway).

The construction cost of the Preferred Alternative is estimated at $400,000,000 (1980 dollars), including overhaul. Total 1982 acquisition cost, including expenses, is approximately $90,000,000.

FEIS at ii; for an in-depth description of the preferred alternative, *see* FEIS at I–1 to I–11.

Defendants, in selecting the preferred alternative, studied and considered 22 build combinations, the no-build alternative, the mass transit alternative, locating the alignment outside the corridor area and upgrading existing facilities.[12] The following, contained in the FEIS/4(f) statement, summarizes the selection of the preferred alternative:

*Selection of the Preferred Alternative*

The Preferred Alternative (Alternative 1–Westerly–WC Easterly) was selected from among a whole field of alignment variations within the two basic corridors studied (Easterly and Westerly), as well as the several crossover routes that linked the two corridors together. The selection of the Preferred Alternative was made by a NJDOT interdisciplinary task force, based upon review of the Draft EIS, comments offered at the public hearings, and subsequent written comments ... These alignments can be combined into 22 variations as follows:

Easterly
Alternate 4—Easterly
Westerly
Alternate 1—Westerly
Alternate 2—Westerly
Alternate 2A—Westerly
Alternate 3—Westerly
Westerly—WC—Easterly
Alternate 1—Westerly—WC—Easterly
Alternate 2—Westerly—WC Easterly
Alternate 2A—Westerly—WC—Easterly
Alternate 3—Westerly—WC—Easterly
Westerly—WD—Easterly
Alternate 1—Westerly—WD—Easterly
Alternate 2—Westerly—WD—Easterly

---

**12.** Plaintiffs vigorously contend that these alternatives were not adequately considered and that the FEIS/4(f) fails to adequately explain their rejection. *See infra.*

Alternate 2A—Westerly—WD—Easterly

Alternate 3—Westerly—WD—Easterly
Westerly—WS—Easterly

Alternate 1—Westerly—WS—Easterly

Alternate 2—Westerly—WS—Easterly

Alternate 2A—Westerly—WS—Easterly

Alternate 3—Westerly—WS—Easterly
Other alternatives considered to serve the transportation needs of the I–287 corridor that were rejected included: not building the Interstate highway, use of mass transit, location of highway alignment outside the corridor area, postponement of the proposed action, and reconstruction of the existing facilities. In addition, a total of 15 alternate alignment variations within the corridor area were also studied and rejected after preliminary investigation, as documented in the Draft EIS.

The FEIS reviewed the following long-term and short-term impacts of the construction of the preferred alignment.[13] As to long term impacts, the FEIS noted the project's purported decongestive impact on traffic operations along the Northeast Corridor. FEIS at iii, see id. at I–18 to 21, II–1 to 5, III–2 to 9, III–35 to 40; 102, 103, 159–160, V–18 to 22, 26 to 46, 105 to 116; A.R. Vol. 15, Item 78A (vol. 1 of the Technical Studies) at 1–452. It noted the adverse impact of the project on natural ecosystems and, particularly, "the removal of vegetation and wildlife habitat resulting from construction and subsequent use of the roadway" in that 745 acres of woodland, 50 acres of field and eight acres of agricultural field will be 'taken', 30% of which would be paved. FEIS at iii. The FEIS further stated that "[n]o plants or animals on the Federal List of rare and endangered species are known to be affected by the project." Id.; see id. at I–21 to 4, II–4 to 8, III–40 to 54, 103 to 106, 112 to 119, 154 to 157, V–59 to 68, 127 to 130; A.R. Vol. 17, Item 78C (Technical Study, Vol. IX) at 1–

231, 1A to 5A, 1B to 6B, 1S to 164S. It noted that the project would result in the "loss of approximately 36 acres of wetland habitat," id. at iv, and that there being "no practicable alternatives to avoid construction in wetlands, all practicable measures will be incorporated to minimize harm to wetlands." Id.; see id. at I–22, II–7, III–33 to 35, 40 to 42, 46 to 50, 106 to 109, 154; V–59 to 62, 80, 82, 87 to 88, 90, 95 to 99, 102, 103a, 128 to 130, 136, 146, 147, 149, 151, 153, 162, 164, 167 to 169; VI–4(f) 36 to 39; A.R. Vol. 18, 78D (Technical Study Vol. IX) at 1–105, 181–201, 207–208, 120–217, 1A, 62–S to 64–S, 122–S to 126–S, 133–S to 136–S.

The FEIS additionally noted the project's longterm impact on noise quality, particularly adjacent to the proposed alignment. FEIS at iv; see id. at II–9, III–32 to 35, 69–78, 123 to 129, 152–153, 157, V–51 to 54, 130–131; A.R. Vol. 18, Item 78D, (Technical Study, Vol. XI) at 1–113, 1–S to 52–S. It noted the project's impact on air quality. FEIS at iv; see id. at I–25 to 26, II–9, III–32 to 35, 59 to 69, 120 to 123, 157 to 158, V–48 to V–50, 131; A.R. Vol. 18, Item 78D, (Technical Study, Vol. XI) at 1–274, 1–S to 38–S. It stated that "[t]otal employment in the five-county Region attributable to I–287 should increase by approximately 7,000 by the year 1995 if the project is built." FEIS at iv; see id. at II–10, III–131 to 142; V–76 to V–77; A.R. Vol. 16, Item 78B (Technical Study, Vol. III) at 7–8, 59 to 78, 91 to 116, 9–S, 23–S to 24–S. It noted the project's impact on land use in the form of projected economic growth to the region. FEIS at iv; see id. at I–32 to 35, II–10 to 11, III–79 to 89, 131 to 151, 159, V–56 to 58, 119 to 121; A.R. Vol. 16, Item 78B (Technical Study, Vol. III) at 1–S to 32–S, impact on historic properties. FEIS at iv; see id. I–29 to 32, II–10, III–78 to 79, 129 to 131, 157, V–54 to 56, V–123, VI–4(f) 58 to 65, 86 to 119; A.R. Vol. 16, Item 78B (Technical Study, Vol. V) at 1 to 126, 1–A to 69–A, 1–B to 51–B, 1–S to 151–S; A.R. Vol. 17,

---

**13.** Plaintiffs challenge the adequacy of the consideration given by defendants in the FEIS to each of these impacts.

Item 78C (Technical Study, Vol. VI) at 1 to 57, 1–A to 57–A, 1–B to 56–B, 1–S to 94–S; A.R. Vol. 17, Item 78C (Technical Study, Vol. II) at 1 to 131, 1–A to 71–A, 1–S to 112–S.

As to the longterm impact of the project on recreational facilities, the FEIS states as follows:

> Four public parks within the study area will be physically affected by the proposed project. These are the Morris County Sunset Valley Golf Course (Pequannock, Kinnelon), Mountainside Park (Pequannock), Campgaw Mountain County reservation (Mahwah), and Darlington County Park (Mahwah).

FEIS at v; *see id.* at I–4 to 5, I–35, III–32 to 35, 96 to 101, 141 to 142, V–46 to 48, 121 to 122, VI–4(f) 1 to 124; A.R. Vol. 16, Item 78B (Technical Study, Vol. III) at 162 to 172, 245 to 263, 20–S.[14] It asserts as well that no alternatives to this "taking" are feasible. Finally, the FEIS noted the longterm impact of the project on communities and neighborhoods regarding accessibility and neighborhood boundaries. FEIS at v; *see id.* at III–89 to 95, 141, V–58; Vol. 16, Item 78B (Technical Study, Vol. III) at 184 to 244, 12–S to 19–S.

The FEIS also reviewed the short term impacts of the project in the following areas: property acquisition and relocation;[15] construction operations, that is, soil erosion and noise;[16] and employment.[17]

As noted *supra*, the FEIS evaluates 37 "build" alternatives in processing the project. Fifteen of these alternatives were found to be unsuitable after preliminary study and were rejected prior to and during the development of the DEIS. *See* FEIS at III–20 to 26. Two of the remaining 22 variations were considered unfeasible (the

easterly alternative and alternate Route 4). *See* FEIS at III–27, 28, 32. Fifteen of the remaining twenty alternatives were rejected insofar as they caused a greater impact to Section 4(f) lands than the preferred alternative. *See* FEIS III–32 to 35; VI–4(f)–35 to 40. The following non-build alternatives which were found not to be prudent or feasible were also evaluated: the "no-build" alternative, the mass transit alternative, the upgrading existing facilities alternative. FEIS VI–4(f)–30 to 34. Lastly, the FEIS considered alternatives suggested subsequent to the 1975 public hearings, specifically, the so-called Parkway alternative, FEIS VI–4(f)–31 to 33, and the Roe Alignment. These, too, were rejected.

The FEIS also identifies, discusses, and recommends various mitigation measures to minimize adverse effects upon Section 4(f) properties. FEIS VI–4(f)–65 to 69. These measures include the incorporation of design features into the project such as noise barriers, and other construction techniques to minimize environmental impacts. Moreover, a parkland replacement program is proposed. FEIS VI–4(f) at 67.

Both the PFEIS and FEIS contain flood plain findings identifying flood plain areas that would be traversed by the preferred alternative. PFEIS at III–105; FEIS at III–109. The flood plain finding also states that these areas could not be completely avoided. The finding determines that the impact to flood plains would be minimal. *See* A.R. Vol. 17, Item 78C (Technical Study, Vol. VIII at 90 and 123 *et seq.*); FEIS at III–154 and III–109.[18]

The preferred alignment set forth in the PFEIS and FEIS received a variety of favorable and critical responses from com-

---

**14.** Plaintiffs contend that five public parks are involved. *See infra.*

**15.** FEIS at v; *see id.* at II–11 to 12, III–95 to 96, V–58 to 59, 117 to 119.

**16.** FEIS at v; *see id.* at III–101 to 102, 128 to 129; A.R. Vol. 17, Item 78C (Technical Study, Vol. III) at 36 to 89; A.R. Vol. 18, Item 78D (Technical Study, Vol. X) at 88 to 91, 34–S to 37–S.

**17.** FEIS at v; *see id.* at 11–10, V. 76–77.

**18.** Executive Order 11988, issued on May 24, 1977, in conjunction with FHWA's implementing regulations (23 C.F.R. § 650.101 *et seq.*) specify that, where practicable, longitudinal flood plain encroachments and crossings which constitute "significant encroachments" should be avoided. *See* discussion *infra.*

menting agencies such as: USDOI, New Jersey Department of Community Affairs, Department of Agriculture, Department of Labor and Industry, Department of Environmental Protection and the New York Department of Transportation. *See* A.R. Vol. 24 at V.

The Section III Matrix, found in the FEIS at III–34 and 35, graphically compares twenty build alternatives and the environmental impacts associates with these alternatives.

On July 22, 1982, NJDOT transmitted a list of the "environmental commitments" made in the FEIS to the FHWA. The document contained a lengthy list of promised mitigation measures. *See* A.R. Vol. 31, Item 37.

Upon receipt of the FEIS/4(f) statement, FHWA conducted a review of the document. A.R. Vol. 25, Item 103, 104. On August 31, 1982, the FHWA Regional Administrator was notified by the Washington Office of FHWA that the FEIS/Section 4(f) evaluation was satisfactory and had been reviewed for legal sufficiency. A.R. Vol. 25, Item 106. A "Decision Statement" for the I–287 project was issued on the same date. The Decision Statement identifies its purpose as providing an understanding of the circumstances surrounding the project and the basis for the decision to build the preferred alternative. It includes a discussion of the background; major issues including project need and alternatives; the supplementation issue; and the Towaco Valley acquifer. The Decision Statement concludes:

1. Adequate consideration was given to all reasonable alternatives.

2. The data contained in the final EIS adequately identifies the environmental effects of the proposed project.

3. The EIS contains sufficient comparative information on impacts of alternatives, forming the basis of a well reasoned decision on the selection of the preferred alignment.

4. The information contained in the FEIS is not significantly different than that presented in previous documents.

5. The issuance of a preliminary final EIS and the procedures used to process it met "both the spirit and the letter of both the council on environmental quality's and FHWA's regulations regarding supplemental EIS's."

A.R. Vol. 25, Item 106.

On September 2, 1982, FHWA approved the FEIS/4(f) Statement and authorized its circulation and filing as the project's FEIS/4(f) Statement. A.R. Vol. 25, Item 106. NJDOT was notified by letter dated September 3, 1982. A.R. Vol. 25, Item 107. The approved FEIS/4(f) evaluation was distributed to appropriate state and federal agencies as set forth in NJDOT's September 9, 1982, letter to John J. Kessler, Jr., Division Administrator, FHWA. A.R. Vol. 25, Item 109–110. On September 7, 1982, FHWA transmitted five copies of the FEIS/4(f) evaluation to the Environmental Protection Agency (Office of Federal Activities) which in turn scheduled publication of the "Notice of Availability" in the Federal Register dated September 17, 1982. A.R. Vol. 25, Items 108, 111. By letter dated September 24, 1982, FHWA formally advised NJDOT that "approval of FEIS constitutes acceptance of the location," A.R. Vol. 25, Item 112, and on October 25, FHWA approved and executed the Record of Decision finalizing approval of the need for and location of the Project. The FHWA Regional Administrator, transmitted the approved Record of Decision for I–287 to John J. Kessler, Jr., FHWA Division Administrator, in accordance with 23 C.F.R. § 771.127. A.R. Vol. 25, Item 114. In December of 1982, design hearings were held at the Pompton Lakes High School. A.R. Vols. 36 and 37 (design hearing transcripts).

On December 3, 1982, the within action was instituted by the filing of a complaint for injunctive and declaratory relief.

In July 1983, Congress mandated the immediate availability of 100 per centum Federal highway trust fund money to New Jersey. Pub.L. 98–63, 97 Stat. 329 (July, 1983).

I turn now to detailed findings of fact pertinent to each of plaintiff's claims. These findings are based in part on the extra-record evidentiary material filed by plaintiffs with this court.

## B. FINDINGS OF FACT AS TO EACH OF PLAINTIFFS' CLAIMS.

**1. Plaintiffs Claim that Defendants NJDOT and FHWA Violated Section 4(f) of the Department of Transportation Act by Impermissibly Routing the Project Through Five Public Parks.**

The proposed extension of I-287 passes through five public parks, physically takes land from at least four of the five, taking a total of 75.4 acres of parkland. In addition, the highway would bisect, without physically taking land, Ramapo Mountain State Park due to prior acquisitions by NJDOT. The acres which would be taken are as follows:

| | |
|---|---|
| 35.3 | in Campgaw Mountain County Reservation |
| 14.3 | in Darlington County Park |
| 20.5 | in Mountainside Park |
| 5.3 | in Sunset Valley Golf Course |
| 75.4 | acres total |

This constitutes approximately 40% more parkland than what would have been taken by the preferred alternative in the DEIS, which took only 49.6 acres. A.R., Vol. 12, Item 67 at 26. This is in part due to (1) the donation of 50 acres of property in 1976 to Mountainside Park, which was subsequent to the approval of the DEIS and (2) the reduction of 25.4 acres due to the fact that the Bergen County Fire Training Center is not a 4(f) property.

When proposed alternative alignments were initially studied and selected, it is undisputed that undeveloped lands were utilized wherever possible to reduce residential displacement. *See* DEIS, Vol. 3 at 153. Some of the initial proposals were chosen by a pre-NEPA, pre-*Overton Park* approach because they were selected before passage of the pertinent federal statutes. *See* Plaintiffs' Experts' Report Evaluation: Final Environmental Impact Statement, prepared by Wallace Roberts & Todd, June 1984 at 47–48 (hereinafter cited

as ("WR & T")). Although subsequent selections of a preferred alternative do indeed coincide with prior selections in some respects, pre-NEPA location studies were re-done in selecting the preferred alternative contained in the PFEIS and FEIS. *See* FEIS at III–19; Zahn Affidavit filed May 10, 1984 at ¶¶ 8, 9. USDOI sharply criticized the DEIS/4(f) statement citing the "extensive use of open space, park and wetland resources" resulting from the pre-NEPA, pre-*Overton Park* approach to route selection. A.R. Vol. 24 at V–142. However the USDOI commended highway officials on selection of the preferred alternative following the filing of the PFEIS. *See* FEIS at V–100–101.

Fifteen variations on the preferred alternative were rejected as unreasonable for reasons summarized in the FEIS at III–20 to III–26 prior to the preparation and filing of the DEIS. Additional alignments east of the preferred Easterly Alternative, were rejected due to extraordinary impacts upon residential areas. DEIS at 29–32. The reasons for rejection of these pre-DEIS variations as set forth in the FEIS are somewhat conclusory and lacking in specifics or evidentiary support. *See* WR & T Report at 17, 21–35. However, the comments contained in plaintiffs' experts' report were never submitted to the agency during the hearing process. To the extent that the DEIS/4(f) statement was criticized by commenting agencies such as USDOI, the 4(f) statement was redrafted. *See supra.* The FEIS restricted itself to alternatives previously considered in the DEIS and did not resurrect alternatives which had been rejected by the agency as unreasonable prior to the DEIS. Nothing in the Administrative Record indicates that any alternative route alignments were proposed but not considered by the defendant agencies.

**2. Plaintiffs' Claim that Defendants NJDOT and FHWA Violated the Procedural Requirements of NEPA as well as the FHWA and CEQ Regulations in Refusing to Supplement the DEIS and Hold Additional Corridor Hearings.**

The DEIS was the subject of extensive criticism by federal and state commenting

agencies. *See* A.R. Vol. 15 at V–40 *et seq.* This criticism was directed to the preferred alignment and to the adequacy of the required consideration of environmental impact and mitigation measures. These comments were influential in leading to the ultimate redrafting of the DEIS in the form of the PFEIS. *See generally,* A.R. Vol. 12, Item 67 (regarding alleged defects in DEIS).

A large quantity of new data was gathered in 11 volumes of technical studies submitted with the FEIS which data did not accompany the DEIS. Pointing in part to this new data, plaintiffs contend that substantial changes in the proposed action had been made and significant new information had been acquired between the time of the DEIS and the FEIS in the following respects:

a. the change from "the Preferred Alternative", selected in 1976, to "the 1–Westerly–WC Easterly Combination" A.R. Vol. 10, Items 55, 58;

b. at the time of the DEIS a principal purpose of the project was to create a circumferential bypass around the New York Metropolitan Area. A.R. Vol. 3 at 24. The effect of this would have been to reroute traffic away from the George Washington Bridge to the Tappan Zee Bridge. Subsequent to 1975 the project sponsors were apprised of dramatic increases in traffic congestion on the Tappan Zee Bridge and the New York State Thruway in the project vicinity. The effect of these increases was to make diversion of traffic to the Thruway and Tapppan Zee Bridge—which had once seemed like a desirable goal—appear as harmful environmental impact, thereby negating one of the project's principal environmental "benefits." Letter of New York State Thruway Authority to NJDOT dated February 11, 1976, A.R. Vol. 15 at V–61. While the problems of increased congestion in New York could arguably be resolved by widening of the Thruway and construction of a new Tappan Zee Bridge the need to consider such actions constituted additional new information of undeniable significance. *Id.*

c. the elimination of an interchange with Darlington Road A.R., Vol. 12, Item 67 at 8;

d. reduction of the highway from 6 to 4 lanes north of Route 208, *id.* at 10;

e. the addition of an interchange with the Paterson-Hamburg Turnpike, *id.* at 9;

f. the reduction to six lanes of the proposed one-mile length of ten-lane section through Oakland where the Preferred Alternative would be coincident with Route 208, *id.* at 10;

g. information pertaining to the project's environmental effects on New York State and Suffern in particular, which had not been discussed at all in the DEIS, *id.* at 11;

h. the elimination of the wide median along the proposed route referred to in (f), *supra,* and its replacement with a New Jersey type center barrier, *id.* at 10;

i. the identification of wetlands that would be affected by the new preferred alternative and the project's environmental impacts thereon, A.R., Vol. 18, Item 78D, Vol. IX;

j. information respecting the impact on cultural resources and historic and archaeological sites of the new preferred alternative, A.R., Vol. 12, Item 67 at 5–7;

k. fundamental changes in transportation and urban policy resulting, in part, from the "energy crisis" as reflected in the Tri-State Regional Planning Commission's Regional Development Guide, containing the region's official and use plan, and Maintaining Mobility Guide, governing the development of future transportation in the region, *id.* at 9;

l. changes in the region's energy policies respecting fuel consumption, *id.* at 17;

m. significant land use and planning changes identified more specifically in local master plans of communities affected by the new preferred alternative, *id.* at 23;

n. substantial new information concerning 4(f) recreational and park land prop-

erties, including the creation of Ramapo Mountain State Park, the major expansion of Mountainside Park and new impacts on Rockledge Park, id. at 24–26;

p. substantial new air quality data and analysis based upon the new traffic data developed subsequent to the preparation of the DEIS, id. at 31;

q. additional water samplings and assessment of impacts on groundwater and the newly designated Buried Valley sole source aquifer, id. at 32;

r. an identification of rare, endangered or threatened plant species that may exist in the corridor of the preferred alternative; A.R. Vol. 24 at V–167; and

s. an identification of rare, endangered or threatened wildlife believed possibly to exist in the corridor of the preferred alternative. A.R. Vol. 9, Item 44(b), Vol. IX at 149, 160–76.

As noted supra, at the time, the NJDOT and the Task Force concluded that whatever the changes and new information were, they did not require supplementation or redrafting of the DEIS. While the FHWA initially came to a contrary conclusion, this conclusion was abruptly superseded and reversed. The only explanation offered at the time was the need to expedite the environmental assessment process for the I–287 project. See generally, Procedural History of I–287 Project, supra.

**3. Plaintiffs' Claim that the FEIS was Inadequate Both in Failing to Demonstrate any Bona Fide Need for the Project and in Making False Statements that Would Lead a Decisionmaker to Erroneously Conclude that a Need Had Been Shown.**

As plaintiffs' correctly note, throughout the history of this project both experts and agencies have expressed the view that there is no real need for the construction of I–287:

a. Alan Sanger, then director of defendant NJDOT, requested in April 1976, that I–287 be dedesignated and concluded that "the strongest arguments [for it were] not transportation but economic and of questionable validity." A.R., Vol. 28, Item 3;

b. The EPA has repeatedly declared that no significant need has been shown for the project. It saw no need for the project in 1976, A.R., Vol. 24 at V–150, and stated in 1981 that the project would have no real effect in terms of facilitating traffic flow on either Intersection 80, the Garden State Parkway, the New York State Thruway, or Route 17. EPA stated that it "remain[ed] unconvinced that I–287 fulfills 'a crucial regional need'" as had been represented in the PFEIS and continued, after receipt of EPA's comments, to be represented in the FEIS. EPA stated that I–287 "does little to improve the regional transportation system and its localized impacts are only minimally beneficial." A.R. Vol. 24 at V–87 to V–88.

And, again in 1982 the EPA rejected any claimed need for the project. (Comments attached to the letter of Anne Norton Miller of EPA to Lloyd Jacobs of FHWA, dated October 14, 1982. These comments are Exhibit "A" to the Affidavit of William T. Smith, Esq., dated December 20, 1983.

c. Plaintiffs' experts, Blayney-Dyett and Alan Davis, P.E., have also concluded that no significant need has been shown for the project.

The Administrative Record indicates that defendants have advanced three basic rationales to support the construction of I–287. These are: (1) the need to relieve congestion on existing local roadways in the project area; (2) the need to reduce travel time for automobiles and trucks travelling across the entire region, and (3) national defense need. Plaintiffs' assert that the first claim is demonstrably false, and directly contradicted by defendants' technical studies, that the second claim is grossly overstated and does not justify the construction of the highway, and that the third claim is unsubstantiated and a relic from 1955.

In particular, plaintiffs contend that the asserted need for I–287 to relieve local

congestion is false for the following reasons:

a. Citing to the report of their own experts, plaintiffs argue that the Administrative Record refutes any claim of severe congestion thus documenting the falsity of such claims in the FEIS in that in 1977, only one of 235 roadway links in the I–287 Study Area network was "severely congested" in the conventional sense of having a Level of Service "E" or "F". A.R. Vol. 15, Item 78A, Vol. I at 115–143. *See* Davis Affidavit at ¶ 4; Dyett Affidavit at ¶¶ 5–7.

b. Again, citing to their own experts, plaintiffs contend that defendants' technical studies show that if severe congestion develops in the future it will not be relieved to any significant degree by construction of I–287 in that according to defendants' technical studies, construction of I–287 will relieve severe congestion on only four links out of a total of fifty-one projected to become severely congested in the future. A.R. Vol. 15, Item 78A, A.R. Vol. I at 115–143; Davis Affidavit, ¶¶ 8, 16.

c. Plaintiffs cite to their experts for the proposition that the projections of severe congestion are premised upon misleading statistics based on outdated population projections, and therefore cannot be relied upon to conclude that future congestion will exist, Blayney-Dyett Report at 8–12; and

d. for the proposition that even if future congestion does develop, it is likely to be alleviated more effectively and at far less cost by upgrading the existing highway facilities rather than by construction of I–287. Blayney-Dyett Report at 12–21; Davis Affidavit at ¶¶ 11, 17.

Plaintiffs further contend that defendants' technical studies and conclusions do not demonstrate that there was existing road congestion. Plaintiffs' expert, Mr. Davis, is of the opinion that severe road congestion by definition exists only when the level of service on a highway has reached the level of service "E" or greater. *See* Davis Affidavit at ¶¶ 12 *et seq*. While

it is undisputed that level of service is defined by a volume to capacity ratio (V/C), Mr. Davis believes that conventionally a volume to capacity ratio of 1.00 can be specified to reflect either a level of service "E" or a level of service "C" and that if a V/C ratio of 1.0 corresponds to level of service "C", then severe congestion will exist only when there are V/C ratios of greater than 1.15. *See id.* Plaintiffs' experts have determined that the V/C ratios in defendants' technical studies accompanying the FEIS were defined so that 1.00 corresponds to level of service "C". *See* Dyett Affidavit at ¶ 7; Davis Affidavit at ¶¶ 12–16. However, the Transportation Planning Study distinguishes "practical capacity" (1.00 equals level of service "C") from "capacity" (.9 to 1.00 equals level of service "E"). *See* A.R. Vol. 15, Item 78A at 20; FEIS at III–4 *et seq; see generally*, F. Howard Zahn's letter to this court dated July 13, 1984 (explaining agency's position in this regard).

Plaintiffs conclude that given that a V/C ratio of 1.0 corresponded to level of service "C", the technical studies reveal that severe congestion existed in 1977 (the most recent data collected) on only one out of 235 roadway link studies, the only one to have a V/C ratio of greater than 1.15. A.R. Vol. 15, Item 78A, A.R. Vol. I at 115–143; Davis Affidavit at ¶ 4; Dyett Affidavit at ¶¶ 5–7. Defendants contend that this conclusion misunderstands the figures in the traffic study. I need not resolve these differences of opinion among the experts in light of my conclusions of law *infra*.

Plaintiffs' experts further assert *inter alia* that the degree of future road congestion in 1995 that could reasonably have been forecast at the time the FEIS was published is greatly overstated in defendants' transportation study and in the FEIS as a result of the use of outdated population data. *See* Blayney-Dyett Report at 8–12. They contend that 1980 census data rather than 1980 census projections for the study area should have been utilized in forecasting future congestion. The Blayney-Dyett Report at 12–16 also states that the studies on which the FEIS was based

ignored planned improvement to local streets which were material to an assessment of the ability of the transportation network to accommodate projected travel demands. Plaintiffs' experts also comment on the statements in the FEIS regarding projected travel time saving, statistics regarding the numbers of travellers who drive through New Jersey to upstate New York as well as the number of trucks on a daily basis which might be expected to use the I-287 extension, if completed. *See generally*, Blayney-Dyett Report.

Plaintiffs also contend that there is no basis in the Administrative Record for the asserted defense need for the completion of I-287. In response defendants' cite, *inter alia*, to 23 U.S.C. § 101(b) which explicitly reflects the congressional finding that the National System of Interstate and Defendant Highways is of "primary importance to the national defense." Defendants also cite to a 1955 evacuation plan and to a 1980 Department of Defense document. *See* A.R., Vol. 10, Item 51.

**4. Plaintiffs Claim that the FEIS Failed to Perform the Legally Required Rigorous Analysis of Alternatives to the Project.**

Plaintiffs critique the agency's rejection of the "No Build Alternative" because it "assumes that no improvement will be made to existing road systems...." A.R. Vol. 24 at III-2. Defendants correctly note, however, that the FEIS separately considered the independent "Upgrading Existing Facilities Alternative." Further, defendants quote the pertinent sentence in full to the effect that:

[i]n this study, the No-Build Alternative assumes that no improvement will be made to existing road systems in order to accommodate traffic that would otherwise use I-287 if it were completed. It must be recognized that the choice of this alternative would not maintain the status quo as present conditions are continually changing and the existing roadway network would become increasingly congested.

FEIS at III-2; *see also, id.* at V-41; VI-4(f)-30, 31. Moreover, the Tri-State Re-

gional Planning Commission which was responsible for the development of an annual Transportation Improvement Program to coordinate all proposed improvement, itself concluded that I-287 was in complete accord with the proposed improvements. FEIS at III-151 and V-104.

Plaintiffs and their experts note the primary upgrade alternative (the widening of U.S. Route 202). *See* WR & T Report at 36-37. However, defendants' rejected this proposal, finding that it would be unreasonable and would involve the taking of 550 homes and 100 business properties. The WR & T Report is conclusory and contains no evidentiary data to the contrary. Finally, plaintiffs contend that the FEIS did not adequately consider de-designation or partial construction of the remaining stretch of I-287.

**5. Plaintiffs' Claim that Defendants Violated Sections 128 and 134 of the FAHA.**

In essence, sections 128 and 154 of the FAHA require cooperation with and consideration of local goals and objectives with respect to urban planning, long range land use and overall goals for social and economic development. *See* Conclusions of Law *infra.*

As noted in the Procedural History section of this opinion, *supra*, in his 1976 Interstate Transfer Report, then Commissioner Alan Sagner of NJDOT recommended de-designation of I-95/695 and I-287, stating that he was convinced that such action would "best serve the following stated objectives of this Administration:

1. revitalization of our urban centers

2. control of random land development

3. maintenance and improvement of our existing transportation corridors and mass transit systems

4. economic development and full employment

and

5. sound environmental and energy policy."

A.R., Vol. 28, Item 3.

Plaintiffs contend that neither the Administrative Record nor the FEIS disclose

the reasons for rejection of the proposal to de-designate or adequately address the project's relationship to the policies and objectives listed by then Commissioner Sagner. In particular, plaintiffs claim that the FEIS fails to acknowledge the project's conflict with the land use master plans of Riverdale, Pequannock, Oakland, Morris and Bergen Counties and with the New Jersey Development Guide Plan. To the extent that the FEIS addresses these alleged conflicts, plaintiffs claim it is inadequate. The Administrative Record addresses the municipal plans in question in a variety of places. *See* A.R. Vol. 16, Item 78B (Technical Study for the Preferred Alternative, Vol. 3 at 147); FEIS at V–56—V–72; *id.* at V–117—V–121. As to the New Jersey Regional Development Guide, the Tri-State Regional Planning Commission specifically commented that "[t]he alignment preferred in the [FEIS] essentially agrees with Tri-State's Regional Development Guide. The completion of I–287 is, therefore, consistent with Tri-State plans and programs." FEIS at V–104. The FEIS also briefly discusses socio-economic impacts of the project in New York. *See* FEIS at III–159.

**6. Plaintiffs Claim that the FEIS Failed to Adequately Consider and Analyze the Substantial Adverse Land Use and Socio-economic Impacts of Constructing the Highway.**

The FEIS was accompanied by a technical study addressed to socio-economic issues and land use. *See* A.R. Vol. 16, Item 78B (Technical Study, Vol. III); *see also* FEIS at I–32 to 35; II–10 to 11, III–79 to 89, 131 to 151, 159; V–56 to 58, 119 to 121. Plaintiffs claim the treatment of these issues is inadequate.

The plaintiffs claim that defendants did not adequately consider alternatives with respect to the number and location of interchanges as a method of mitigating adverse impacts of the project. After the public hearings, NJDOT evaluated the interchange locations in response to public comments. FEIS at V–23, 25. Subsequently, in 1982 after design hearings, an additional

interchange was eliminated. *See* A.R. Vol. 36 at 11; Vol. 37. Plaintiffs' experts state that the defendants failed to follow accepted interchange analysis procedures and failed to adequately analyze the land use and secondary development impacts of the project. *See* Blayney-Dyett Report at 38–40; WR & T Report at 54–56. In particular, the WR & T Report states that secondary development impact should have been studied for each interchange individually. These criticisms were not presented to defendants prior to preparation of the FEIS.

**7. Plaintiffs Claim that Defendants' Inadequate Consideration of Adverse Impacts Upon Wetlands and their Failure to Devise Appropriate Mitigation Measures Constitute Violations of NEPA and Executive Order 11990.**

According to the FEIS, I–287 will "channelize" two streams, FEIS at III–105, 161, destroy seven wetlands areas containing approximately thirty-six acres of wetlands, *id.* at III–106, and fill six ponds. The 36 acres of affected wetlands represent a reduction of 16 acres from the 52 acres of wetlands identified in the PFEIS. PFEIS at III–106. This reduction of affected wetlands between the PFEIS and the FEIS is due to a modification implemented to avoid the flood plain which surrounds Allerman Brook. FEIS at III–109.

As acknowledged by defendants, the waters and wetlands that would be harmed by I–287 perform the following functions: (1) produce and channel essential nutrients to the natural food chain; (2) provide critical habitat for diverse species of wildlife; (3) constitute an important buffer against flooding by storing runoff from surrounding watershed areas; and (4) provide a vital link in local drinking water supplies. by recharging groundwater acquifers. A.R. Vol. 24 at III–107; A.R. Vol. 18, Item 78D, Vol. IX at 1–A. Defendants do not dispute the importance of the wetlands in question.

Defendants took care to avoid harming wetlands. At the suggestion of EPA, a Wetlands Task Force was assembled to formulate a detailed wetlands mitigation compensation. plan. FEIS at III–108; V–

87. Moreover, in 1981 defendants modified the preferred alternative to minimize harm to wetlands. FEIS at III–28, 33. Lastly, the FEIS contains a "Wetlands Finding" which specifically identifies wetlands areas that will be affected by the I–287 project and an explanation for the finding that no practicable alternative to avoid these seven wetlands areas exists. FEIS III–106. No commenting agency objected to this finding.

Plaintiffs' experts state that the FEIS and accompanying technical studies do not follow commonly accepted practices of describing or mapping wetlands affected by the project. *See* WR & T Report at 84–94. The accepted practices referred to by plaintiffs' experts and developed by FHWA and the FWS were not enunciated by these agencies until after circulation of the PFEIS on September 1, 1981 and after the FEIS was prepared.

Plaintiffs assert that treatment of wetlands in the FEIS lacks detail, fails to describe the particular function of each impacted wetland area, and fails to address the comparative impact of each alternative on wetlands.

A review of the FEIS reveals that defendants did consider the impact of each alternative upon wetlands. The wetlands mapping contained in the FEIS was based upon U.S. Fish and Wildlife Service National Wetlands Inventory and wetlands were designated by size. FEIS III–48. Furthermore, wetlands were mapped in the technical studies, particularly along the route of the preferred alignment. A.R., Vol. 18, Item 78D, (Technical Studies) Vol. 9 at pages 97 to 104; 63–S.

Lastly, the FEIS contains a discussion of the effects of all alternatives upon vegetation, wildlife, geology and sociology. FEIS at III–40 to 59. For purposes of comparison, the environmental impacts associated with all prudent alternatives are also contained in a matrix set forth in the FEIS at III–34 to 46. The wetlands affected by I–287 were identified through field investigations. FEIS at V–61, 98. Such investigations also sought to identify practicable alternatives. A.R. Vol. 34, Item 87. The FEIS discussed each proposed alternative and concluded for the reasons stated therein that "shifts in the alignment of the Preferred Alternative to avoid the seven wetland areas are not practicable." FEIS at III–107 to 108.

Commenting agencies sharply criticized the treatment of wetlands in the PFEIS. *See, e.g.,* A.R. Vol. 24 at V–94 (comments of the Army Corps of Engineers), *id.* at V–87 to V–88 (comments of EPA). Although the FEIS in part reprinted the wetlands section of the PFEIS, defendants did respond to these comments and changes were made. *Compare* A.R. Vol. 15, Item 78A, pp. III–104 to 106 (wetlands finding in the PFEIS) *with* FEIS at III–106 to 109 (wetlands finding in the FEIS). *See also* A.R. Vol. 33, Item 88.

As to consideration of mitigation measures, the FEIS establishes an inter-agency wetlands task force whose very purpose is to formulate a wetlands mitigation plan. EPA, DOI, ACOE, NJDEP, NJDOT and FHWA have all designated members to serve on this task force. Further, the FEIS identifies a variety of mitigation measures which will be employed. *See* A.R. Vol. 24 at III–108. The task force has considered one-to-one replacement of affected wetlands if funding is available. *See* A.R. Vol. 25, Item 115, p. 4; *see also* A.R. Vol. 32, Item 91 at 2.

**8. Plaintiffs Claim that Defendants' Inadequate Consideration of Adverse Impacts Upon Floodplains and their Failure to Devise Appropriate Mitigation Measures Constitute Violations of NEPA and Executive Order 11988.**

It is undisputed that I–287 will cross five floodplain areas associated with stretches of the Pequannock River, the Ramapo River and Pond (Allerman) Brook if completed. FEIS at III–109; WR & T Report at 112. Technical Study Vol. VIII at 86 states that the project will "cause water level increases of up to about 0.5 feet, thereby causing some minor flooding or modest increase in flooding in flood-prone areas" but that these effects "will largely be eliminated by

relatively minor modifications in their design during final design." The Technical Study addressing flooding determined that the impact of the project would be minimal based on the following: (1) that crossings of the Pequannock River, Ramapo River in Oakland, and the Ramapo River in Mahwah are perpendicular crossings which will be spanned on structure, A.R., Vol. 17, Item 78C (Technical Study Vol. VIII) at 90, 123 *et seq.*, (2) the "Ramapo River Flood impact analysis [I–287] interchange with New York Thruway," *id.* at 1–B; *see also* FEIS at III–154 and (3) the fact that "the longitudinal encroachment of the flood plain which surrounds the stream [Allerman Brook] has been avoided by utilizing the existing Route 208 corridor with only minor widening." FEIS at III–109.

Defendants further argue to this court that construction of I–287 could not proceed without permits from the U.S. Army Corps. of Engineers and from the NJDEP both of which will require the project to meet certain floodplain protection standards.

The treatment of floodplains in the FEIS was based on maps prepared by the United States Department of Housing and Urban Development (HUD). *See* FEIS at III–109.

Plaintiffs' experts critique the FEIS for its alleged failure to adequately analyze "highway induced development's potentially significant reduction in the rate of recharge from impervious surfaces." WR & T Report at 116–18. However, the Township of Montville submitted a technical report regarding such impacts on the Towaco Valley Acquifer. *See* A.R., Vol. 29, Item 15; *see also* FEIS at V–62 to 68; A.R, Vol. 25, Item 106–08. The FEIS concluded that ground water contamination from highway runoff will not present a serious problem. FEIS at V–87; *see id.* at III–110 to 111, V–64 to 69, V–123 to 127.

**9. Plaintiffs' Claim that Defendants Failed to Adequately and Fairly Consider the Impacts of the Project on Wildlife Generally in Violation of NEPA.**

The Terrestrial Ecosystems section of the FEIS provides as follows:

Total right-of-way takings for this project are approximately 1300 acres, of which 26% is presently developed. Of the undeveloped acreage, 745 acres of woodland, 50 acres of abandoned fields and 8 acres of agricultural fields are within the proposed right-of-way. About 30% of the right-of-way will be paved. To the maximum extent possible, existing vegetation will be maintained in areas within the right-of-way including embankments, medians, open spaces, etc.

FEIS at III–103. Plaintiffs' experts contend that over 800 acres of this land is wildlife habitat, *see* WR & T Report at 10 and 100, and that the taking of these acres will have a secondary adverse impact on state endangered or rare species. *Id.* at 100–01. In particular the rattlesnake is on the endangered species list pursuant to the New Jersey Endangered and Nongame Species Conservation Act, N.J.A.C. 7:251101. None of these species is included in the federal endangered species list. *See* discussion *infra*.

The FEIS concluded as follows:

The Bog and Vly meadows provide suitable habitat for the Bog turtle ... and the Blue-Spotted Salamander ..., both of which are protected by Chapter 309, 'Endangered and Non-Game Species Conservation Act' of the State of New Jersey. The preferred alternative will remove approximately 36 acres of wetlands; however none are within the Bog and Vly meadows and none appear to provide suitable habitat for these two species. No specimens of either the Bog Turtle or the Blue-Spotted Salamander were identified during field surveys.

FEIS at III–106. These conclusions were based in part on field surveys and on the Natural Ecosystems Technical Study. A.R., Vol. 18, Item 78D (Vol. IX).

The study explained that:

The entire route of the Preferred Alternative was walked for the purpose of identifying the vegetation and wildlife habitat.

To determine the existing wildlife along and adjacent to the proposed I–287 Route, a long term field observation and trapping program would have been necessary. Through field observations that were made, and consideration of the existing wildlife habitat and literature reviews, a composition of the wildlife population was inferred. This was sufficient for birds and mammals. However, the literature review identified potential habitat of rare or endangered reptiles and amphibians along the route. A detailed field survey was performed to study the habitat along the preferred alignment. A.R., Vol. 9, Item 44B and Vol. 18, Item 78D at 94. Plaintiffs' experts critique this methodology. *See* WR & T Report at 104–05. Certain birds, not on the endangered species list, such as the pied-billed grebe, the great blue heron, the red headed woodpecker and the red shouldered hawk are occasional visitors to or summer breeders in the project area. *Id.* at 142–48. Reptiles and amphibians are discussed as well. *Id.* at 149–80. No specimens were found during the field survey. The technical study states that the "probability of this species [the timber rattlesnake] existence within or adjacent to the proposed route is remote." *Id.* at 176.

Plaintiffs' experts contend that the technical studies did not follow an adequate species sampling program or a quantitative habitat evaluation procedure (HEP). *See* WR & T Report at 99–100. Such procedures were developed by FWS and are generally accepted but are not generally utilized in preparing an EIS.

With regard to the supposed impact of future secondary highway-induced development on wildlife, the PFEIS stated as follows:

Perhaps of as much significance to the future of wildlife habitat in the area as the result of construction of I–287 itself, is the development which may be attracted by its completion. Existing natural areas would be taken for increased residential, industrial and commercial uses and wildlife habitat would be lost. It is impossible to predict how much land development is attributable to the presence of I–287 and one can only speculate on the eventual impact to wildlife habitat. The westerly alternative would [sic] have a greater impact in this regard, since they would encourage development in the area of most extensive wildlife habitat.

PFEIS at III–49.

Measures to mitigate these and other adverse impacts on wildlife generally are identified and analyzed in the technical study. A.R. Vol. 18, Item 78D. Additionally, certain mitigation measures have been incorporated into the roadway design and route selection. Support columns for the structure that will span the Wanaque River have been excluded to maintain natural flow characteristics. *Id.* at 220. There will be no channelization of the Beaver Dam Brook, the west ditch or the east ditch. Also, by utilizing a larger portion of Route 208, most channel alterations of the Allerman Brook will be avoided. FEIS at III–109, and V–90. This will minimize the effects on the aquatic biota. *Id.* The decision to avoid the Bog and Vly Meadows is also a mitigating feature of the preferred alignment. FEIS at III–106.

Criticism of the treatment of the project's impacts upon wildlife was expressed by the ACOE, the DOI and the NJDEP. A.R. Vol. 24 at V–81, V–95, V–102. The comments of these agencies were considered and responded to in the FEIS. FEIS at V–81, V–98 to 99, and V–103(a).

**10. Plaintiffs' Claim that Defendants NJDOT and FHWA Violated the Endangered Species Act by Failing to Consult, to Prepare a Biological Assessment and to Determine the Project's Impacts Upon the Endangered Small Whorled Pogonia.**

The small whorled pogonia, a genus of terrestrial orchid, is a federally listed endangered species. *See* 47 Fed.Reg. 39827 (1982). It was placed on the list on September 10, 1982. It became effective October 12, 1982. *Id.* It was formally proposed for listing on September 11, 1980, prior to preparation of either the PFEIS or the

FEIS. *See* 45 Fed.Reg. 59911 (1980). The notice of review proposing the small whorled pogonia as an endangered species states that the last reported sighting of this species in the project area was in Franklin Lakes in 1935. The notice further states that "[n]one are now known to exist at this site." *Id.* In 1979, when the small whorled pogonia was about to be proposed for listing, and again in 1981, the ACOE apprised defendants of this fact by letter. *See* A.R. Vol. 24 at V–167 and Vol. 24 at V–95, V–100.

Neither the PFEIS nor the FEIS nor their accompanying technical studies or documents address the issue of this species of pogonia except that the FEIS responded to ACOE's 1981 letter. *See* FEIS at V–98. In defense of the absence of any biological assessment on the small whorled pogonia or any consultation with other federal agencies regarding the species, defendants point to a letter from USDOI to FHWA of December 28, 1981 stating in pertinent part as follows:

> [T]he Endangered Species Act requires consultation only in regard to Federal actions that may affect listed species and requires 'conference' only in regard to actions that may affect proposed species. There is no responsibility to consult or confer with FWS regarding candidate species since these species are not accorded protection under the Act. This plant is identified at this time for the sole purpose of notifying you in advance of a possible listing which at some future time may have to be considered in planning Federal activities.

FEIS at V–100.

Defendants acknowledge that subsequent to the approval of the FEIS, and subsequent to the listing of the small whorled pogonia as an endangered species, the Endangered Species Act was amended (P.L. 97–304) (October 13, 1982) so as to require a biological assessment with respect to species if those species *will be* affected by the project. With this change in the law, NJDOT and FHWA formally consulted DOI regarding the small whorled pogonia.

This occurred subsequent to the institution of this litigation and was therefore separately documented. Said documentation was provided to the Court in response to these claims of the plaintiff which were raised for the first time in their compilation of point briefs. *See also* Memo prepared by Joe Sweiger dated January 13, 1984 which is appended as Exhibit A to the State Defendant's brief in response to Plaintiffs' Compilation of Point Briefs. At this time, defendants expressed their opinion that the small whorled pogonia was not present along the project alignment. *See* letter of Lloyd J. Jacobs to John J. Kessler dated January 20, 1984 appended to Federal Defendants response to Plaintiffs' Compilation of Point Briefs. USDOI has concurred in this opinion. *See* FEIS at V–100. The Notice of Review at 45 Fed.Reg. 59911, quoted *supra,* further substantiates defendants' conclusions in this regard. I note that plaintiffs have not, by their experts or otherwise, submitted evidence to the contrary.

**11. Plaintiffs' Claim that Defendants NJDOT and FHWA Have Violated the Fish and Wildlife Coordination Act.**

Plaintiffs rely on their proposed findings of fact numbers 126–36 submitted in support of their claim regarding the FEIS treatment of wildlife generally under NEPA. Therefore, this court will do the same.

**12. Plaintiffs' Claim that Defendants FHWA and NJDOT Violated the Requirement of FAHA that they Develop a Detailed Soil Erosion Control Plan.**

Plaintiffs contend that defendants FHWA and NJDOT have deferred to some indefinite point in the future their development of a detailed plan to control soil erosion, thereby excluding such plan from the EIS process despite repeated warnings by federal and state agencies that such a plan should be included in the FEIS. *See* A.R. Vol. 24 at V–76, V–80, V–95; Vol. 41 at 211–12. In response, defendants argue that standard practice is to develop a soil erosion and sediment control plan during

the final stages of the highway design and prior to the approval by FHWA of the plans, specifications and estimates (PS & E).

The FEIS states that "[a] soil erosion and sediment control plan will be developed as an integral part of the construction plans." FEIS at III–108. This commitment was reiterated in several responses to comments which are included in the FEIS. For example, in response to a comment by USDOI, the FEIS states: "In order to protect sensitive aquatic resources and to minimize siltation, the NJDOT will require strict adherence to a carefully designed sediment and erosion control plan throughout the construction period." FEIS at V–81. In addition, in response to a comment by the U.S. Department of Agriculture, Soil Conservation Service, the FEIS states:

> A soil erosion and sediment control plan for the construction of the Preferred Alternative will be implemented by the NJDOT. The 'Standards for Soil Erosion and Sediment Control in New Jersey' will be followed in developing this plan. In addition, the U.S.D.A. Soil Conservation Service and the Northeast Jersey Soil Conservation District will be consulted during the development of this plan

FEIS at V–137.

Finally, by letter dated July 22, 1982, NJDOT notified FHWA of a list of the environmental commitments made in the I–287 FEIS. Among these commitments was a statement that "NJDOT will require strict adherence to a carefully designed sediment and erosion control plan throughout the construction." A.R. Vol. 31, Item 37 at 3.

**13. Plaintiffs' Claim that Defendants NJDOT and FHWA Violated the Intergovernmental Cooperation Act.**

Plaintiffs rely on their proposed findings of fact numbers 89–97 submitted in support of their claims regarding sections 128 and 134 of the FAHA and the FEIS treatment of socio-economic and land use impacts. Therefore, this court will do the same.

**14. Plaintiffs' Claim that Defendant EPA Has Violated Section 309 of The Clean Air Act.**

Plaintiffs rely on their proposed findings of fact numbers 58–87 submitted in support of their claims regarding inadequacies in the FEIS as to demonstration of need for the I–287 project. Therefore, this court will do the same.

**15. Plaintiffs' Claim that Defendants Have Not Submitted the Complete Administrative Record Thus Judgment May Not Be Rendered in Their Favor.**

This court has already ruled on the questions involved in this claim. *See* discussion *supra* and the prior rulings of this court.

### III. CONCLUSIONS OF LAW.

### A. OVERVIEW OF NEPA, DOTA AND FAHA.

NEPA is essentially a procedural statute, *see Stryckers Bay et al. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 443 (1979), which seeks to ensure agency consideration of the environmental impact of a proposed action and communication of this process to the public. *See Baltimore Gas and Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *Columbia Basin Land Protection Assn. v. Schlesinger,* 643 F.2d 585, 592 (9th Cir. 1981). Though procedural in nature, the Act represents a legislative effort:

> [to] declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321. The Act requires that this policy be considered in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the hu-

man environment," *id.* at § 4332(2)(C), and further provides that the "responsible official" file a "detailed statement," known as an Environmental Impact Statement (hereinafter "EIS") discussing:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* Further, the "official" must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved" and must make the EIS available to the President, the Council on Environmental Quality (hereinafter "CEQ") and the public. *Id.* Finally, the "official" must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources...." *Id.* at § 4332(2)(E). In sum, "[t]he goal of NEPA, therefore, is to control the more destructive effects of man's technology on his environment...." *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d 613, 624 (3d Cir. 1971). The EIS is the device that promotes the fulfillment of this statutory objective. *Township of Springfield v. Lewis et al.,* 702 F.2d 426, 429 (3d Cir.1983).

Section 4(f) of the DOTA states in pertinent part as follows:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and con-

sult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 1653(f). What has become known as the "section 4(f) statement", containing the two determinations set forth in the statute, generally accompanies the EIS. In making the requisite determinations:

[t]he Secretary's scrutiny must not be cursory, for DOTA's compass is broad: 'Congress articulated in § 4(f) a disparate weighting against the use of parkland for highway projects. It said, don't use greenlands, but if you must do so, be practical and cut harm to the minimum. It did so in recognition of the fact that it is always easier to build highways through publicly owned parks because people and their homes, businesses, schools and churches will not have to be displaced and its acquisition costs little or nothing. This thumb-on-the-scale approach is required whenever the parkland is to be used. If courts were to interpret this section to permit an initial appraisal of whether the use was substantial, it would infuse consideration of elements (such as the degree of harm to the park, animal life, environment, etc.) which Congress did not want considered

when it said, if there is another way, take it. **Any park use, regardless of its degree, invokes § 4(f).'** *Louisiana Environmental Society, Inc., v. Coleman,* 537 F.2d 79, 84 (5th Cir.1976) (emphasis added).

*Township of Springfield,* 702 F.2d at 430.

Any portion of the federal interstate highway system constructed with 90 percent federal funds is subject to the rules and standards of the FAHA. *Id.* The Act sets forth procedural prerequisites for approval of a planned highway by the United States Secretary of Transportation and structures the relationship between the FHWA and the state DOT in this regard. The FAHA reiterates the environmental concerns of NEPA and DOTA in language which is virtually identical to section 4(f) of DOTA quoted *supra. See* 23 U.S.C. § 138; *Township of Springfield,* 702 F.2d at 430.

Generally, the state DOT selects a route for the proposed highway and the secretary approves it. 23 U.S.C. §§ 103(d), (e)(1). The state DOT must submit a proposal with specifications and estimates, *see id.* at §§ 105(a), 106(a), accompanied by a certification that it has held public hearings on the location of each project. 23 U.S.C. § 123. Following final approval the state DOT and the FHWA enter into construction agreements, bids are accepted, contracts awarded and construction commenced under the state's supervision. *See* 23 U.S.C. § 112, 114. *See generally, Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1328 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

The Act provides in pertinent part as follows:

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of or, going through any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed locations of such highway. Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.

(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification and report.

23 U.S.C. § 128.[19]

The regulations promulgated by FHWA speak in terms of two types of hearings: "corridor public hearings" and "design public hearings." 23 C.F.R. § 790.5(a). A "corridor public hearing" is held "before the route location is approved and before the state highway department is committed to a specific proposal." *Id.* at § 790.3(a)(1). The purpose of the hearing is "to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway"

**19.** The regulations promulgated by FHWA provide that the opportunity for such hearings must be afforded where a Federal-aid highway project:
 (1) Is on a new location; or

(2) Would have a substantially different social, economic, or environmental effect; or
(3) Would essentially change the layout or function of connecting roads or streets.
23 C.F.R. § 790.5(a) (1980).

and to provide "a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations." 23 C.F.R. § 790.3(a)(2)–(3). A "design public hearing" is held "after the route location has been approved, but before the state highway department is committed to a specific design proposal." *Id.* at § 790.3(b)(1). Design hearings have a similar purpose. *See* 23 C.F.R. § 790.-3(b)(2)–(3).

In sum, "[c]onsidered together, NEPA, DOTA, and FAHA thus require a complex of reports and studies—including an EIS, a section 4(f) statement, and public hearings—before a federally financed highway such as [I–287] can be built." *See Township of Springfield,* 702 F.2d at 432.[20]

## B. STANDARD OF REVIEW.

■ It is undisputed that a court reviewing "an agency decision to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement," *Concord Township v. United States,* 625 F.2d 1068, 1073 (3d Cir.1980) (footnote omitted) has "a limited, albeit important," role. *See Baltimore Gas and Electric,* 103 S.Ct. at 2256. The court's role in this regard is "to determine whether all necessary procedures were followed, to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion. The reviewing court must adopt that posture because NEPA, while establishing significant substantive goals for the Nation, imposes upon agencies duties that are essentially procedural. NEPA was designed to insure a fully informed and well-considered decision, but not necessarily a decision the judges of the Court of Appeals or of the Supreme Court would have reached had they been members of the decisionmaking unit of the agency. Once

an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Township of Springfield v. Lewis,* 702 F.2d at 441 (citations omitted); *see* Administrative Procedure Act, 5 U.S.C. ¶ 706(2); *accord, Baltimore Gas & Electric,* 103 S.Ct. at 2256 citing *Overton Park,* 401 U.S. at 415–17, 91 S.Ct. at 823–24; *Concord Township,* 625 F.2d at 1073.

In performing this task, a district court must perform a "thorough, probing, in-depth review" of the administrative record and the agency decision in question, *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823, in order to ensure that the agency has taken "a 'hard look' at the environmental consequences" of the proposed action. *Baltimore Gas and Electric,* 103 S.Ct. at 2256 quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

Considering whether an agency rule is arbitrary or capricious the Supreme Court has stated that:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

It is clear, however, that the agency decision is entitled to a "presumption of regularity," *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823, and "[a]dministrative decisions

---

**20.** I have provided this overview at the outset because it is pertinent to the standard of review set forth in the next section. My Conclusions of Law regarding each of plaintiffs' claims will be set forth *infra.*

should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute ..., not simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) quoted in *Baltimore Electric and Gas,* 103 S.Ct. at 2256. In *Kleppe,* the Supreme Court stated that:

NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." ... NEPA was designed "to insure a fully informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency." ... [O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' "

427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (citations omitted); *Township of Springfield,* 702 F.2d at 441. Further, perfection is not required and an agency "decision of less than ideal clarity [will be upheld] if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *see Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215.

The Third Circuit has refined this standard affirming the use of a reasonableness or "rule of reason" approach in certain circumstances. In *Township of Springfield,* the court stated:

... the "rule of reason" is what a court invokes when faced with the contention

that the agency never considered certain information or alternatives at all: if the only alternatives not explored are those that it was not rational for the agency to have explored, the agency acted properly. The arbitrary-and-capricious standard, on the other hand, would apply when the court reviews how the agency dealt with the information and alternatives it did consider. Accordingly, under the district court's approach, we can require an agency to consider only what it reasonably should have considered; the consideration it actually accorded is subject to a more deferential standard of review.

702 F.2d at 442 n. 29. Although the distinction between these two standards tend to blur at times, "[i]t is generally thought that the 'reasonableness' standard of review is 'far less deferential' to agency decisionmaking than is the 'arbitrary and capricious' standard." *Id.* at 437 n. 16 (citations omitted). As between these two standards, the Third Circuit has assumed without deciding that the stricter scrutiny of the "reasonableness" standard might apply to an agency decision not to revise and recirculate an EIS already prepared. *E.g., Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 278 n. 5 (3d Cir.1983); *Township of Springfield,* 702 F.2d at 436.[21]

█ As a general matter, where a party challenges the adequacy of an EIS, that party bears the burden of proving by a preponderance of the evidence that the EIS is inadequate. *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 119 (5th Cir.1983); *Sierra Club v. Froehlke,* 534 F.2d 1289 (8th Cir.1976); *Sierra Club v. Morton,* 510 F.2d 813 (5th Cir.1975).

█ In applying this standard of review to a case in which plaintiffs challenge the technical data upon which the substantive agency decision was made, it is clear that

---

21. The use of the less deferential standard with regard to such agency decision could presumably be justified by the central role of the EIS in the statutory scheme. *See Morris County,* 714 F.2d at 274 (describing the preparation of the EIS as the "heart and soul" of NEPA). Without

some heightened assurance that the agency has reasonably complied with the procedural requirements of the statutes the rationale for deference to the agency's substantive decisions would be undermined.

this court may not credit the opinions of plaintiffs' experts over those of defendants' experts absent a showing that defendants' analysis is faulty or performed in bad faith. *See County of Suffolk,* 562 F.2d at 1386. "The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS. The court's task is merely to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental facts. The court is not empowered to substitute its judgment for that of the agency. This is particularly true when it comes to evaluating the factual conclusions of the EIS. In the agency's conclusions have a substantial basis in fact, and if the EIS has set forth responsible opposing scientific views, it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decision." *County of Suffolk v. Secretary of Interior,* 562 F.2d at 1383 (citations omitted). As the Second Circuit has stated, a court "is neither required, equipped, or inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that the construction of a highway is the most viable solution to project traffic needs in the future. There is no duty for the district court to embroil itself in the type of detail which a plaintiff may urge is necessary to determine if there has been procedural compliance with NEPA. Clothing its complaint as 'procedural' is an inventive way for a plaintiff to invite the court to enter the very areas forbidden to it. It is tantamount to requesting the court to act as the decisionmaker in the guise of securing procedural compliance.... Deciding technical disputes between contesting parties is not the means by which the procedural sufficiency of an FEIS will be measured by the court." *CBET v. Volpe,* 650 F.2d 455, 462 (2nd Cir.1981).

In short, when a plaintiff challenges the defendants' technical studies, and the only contrary evidence it offers is evidence it is introducing for the first time in the Federal court, such as an affidavit from another expert questioning the methodology of and conclusion reached by the defendants, the defendants' finding must be accepted unless it is arbitrary. Mere disagreement among experts will not serve to invalidate an EIS. *Life of the Land v. Brinegar,* 485 F.2d 460, 472–73 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). If reasonable persons could rely on the agency's studies to reach the agency's conclusion, the conclusion is not arbitrary. *Commonwealth of Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714, 720 (6th Cir.1981). *See also Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d 783, 787 (D.C.Cir.1971).

## C. CONCLUSIONS OF LAW AS TO EACH OF PLAINTIFFS' CLAIMS.

**1. Plaintiffs' Claim that Defendants NJDOT and FHWA Violated Section 4(f) of the Department of Transportation Act by Impermissibly Routing the Project Through Five Public Parks.**

As noted *supra,* section 4(f) of the DOTA, 49 U.S.C. § 1653(f), now contained in 23 U.S.C. § 138, prohibits construction of federally funded highways through publicly owned parkland unless there is no prudent and feasible alternative to such construction, and all possible planning has been done to minimize harm to parks. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *Overton Park* has defined "feasible" to mean that "as a matter of sound engineering, it would not be feasible to build the highway along any other route." 401 U.S. at 411, 91 S.Ct. at 821, the term "prudent" has been construed to mean that parkland should not be taken for highway construction "unless a prudent person, concerned with the quality of the human environment, is convinced that there is no way to avoid doing so." *Monroe County Conservation Council, Inc. v.*

*Volpe,* 472 F.2d 693, 700 (2d Cir.1972) (footnote omitted). Although cost, directness of route and community disruption are relevant factors in determining whether there are prudent and feasible alternatives, before they can be decisive, FHWA Regulations require that "[s]upporting information must demonstrate that there are unique problems or unusual factors involved in the use of alternatives, and that the cost, environmental impacts, or community disruption resulting from such alternatives reaches extraordinary magnitudes." 23 C.F.R. § 771.135(a)(2). Conclusory or vague statements are insufficient. As a general matter, a federal agency may reasonably believe that there is no feasible and prudent alternative to the taking of § 4(f) land when the alternatives would result in extraordinary impacts to residential areas, *e.g. Citizens to Preserve Wilderness Park v. Adams,* 543 F.Supp. 21 (D.Neb.1981), *aff'd,* 685 F.2d 438 (8th Cir. 1982), or would adversely affect low income housing or church property. *See Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341, 1360–61 (E.D.Pa.1977).

With regard to section 4(f), plaintiffs argue that (1) the defendants rejected reasonable alternative alignments prior to the preparation of the DEIS, (2) the DEIS failed to adequately consider the alternatives selected for study and finally that defendants failed to meet their section 4(f) requirement to consider all feasible and prudent alternatives to the taking of parkland and failed to minimize the impact of the project on such lands.

 As to the rejection of alternatives prior to preparation of the DEIS, it is clear that "[t]ime and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). In short, an agency is only re-

quired to consider information and alternatives which "it reasonably should have considered." *Township of Springfield,* 702 F.2d at 442 n. 29. Applying these standards to my findings of fact *supra,* I find that the agency's selection of alternatives for study and presentation to the public in the DEIS was proper and that the agency could rationally have concluded that the alternatives rejected at the pre-DEIS stage were unreasonable in their impact on residential neighborhoods.

Furthermore, a significant factor in whether the specificity of an agency's examination of alternatives is an abuse of discretion is whether the participation in agency proceedings by intervenors was meaningful. It is incumbent upon intervenors who wish to participate, to structure their participation so that it is meaningful, that is, so it alerts the agency to the intervenors' position and contentions. Thus, a plaintiff "clearly does not meet its obligation of meaningful participation when it fails to inform the [agency] of the [plaintiff's] position at a time when the [agency] could have taken any necessary corrective action without undue delay." *Commonwealth of Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714, 718 (6th Cir. 1981); *see also Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir.1980), *citing Vermont Yankee,* 435 U.S. at 549– 555, 98 S.Ct. at 1214–1217 (regarding court consideration of phase at which alternative is brought to agency's attention). Plaintiffs have failed to demonstrate that their complaints regarding the pre-DEIS rejection of alternatives were brought to the agency's attention at a meaningful time.

I turn now to plaintiffs' claim that the discussion and evaluation of alternatives studied and presented in the DEIS/4(f) was inadequate. "The discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837 (D.C.Cir.1972); *see Farmland*

*Preservation Assn. v. Goldschmidt,* 611 F.2d 233 (8th Cir.1979). Perfection is not required, *e.g., Inman Park Restoration v. UMTA,* 414 F.Supp. 99, 112–13 (N.D.Ga. 1976), *aff'd,* 576 F.2d 573 (5th Cir.1978), so long as the agency has taken a "hard look" at all reasonable alternatives and environmental impacts. *Id.; see Kleppe v. Sierra Club,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21. Moreover, "circulation of even a deficient Draft EIS/[4(f)] may be sufficient so long as it does not frustrate the goal of obtaining informed agency and public comment. *National Wildlife Federation v. Adams,* 629 F.2d 587 (9th Cir.1980); *Lathan II,* 506 F.2d [677] at 693 [ (9th Cir.1974) ]. *See also, Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1022–23 (9th Cir.1980)." *Adler v. Lewis,* 675 F.2d 1085, 1096 (9th Cir.1982). Even if a draft EIS does not discuss each issue in technical detail, it is sufficient if it provides a meaningful basis for comment. *Id.*

█ Applying these standards to my findings of fact *supra,* I find that the agencies in question took a hard look at the impact of the proposed preferred alignment on section 4(f) property and at all reasonable alternatives. The rejection of alternatives, including the "no build" and "upgrade existing facilities" alternatives, and the selection of the preferred alternative was neither arbitrary nor capricious as re-

vealed by a searching review of the administrative record in this case. *See Township of Springfield,* 702 F.2d at 442 n. 29. In short, decisionmakers could have reasonably believed that there was no feasible and prudent alternative to the use of section 4(f) lands and that the project includes all possible planning to minimize harm.

**2. Plaintiffs Claim that Defendants NJDOT and FHWA Violated the Procedural Requirements of NEPA as well as the FHWA and CEQ Regulations in Refusing to Supplement the DEIS and to Hold Additional Corridor Hearings.**

Where an FEIS is not filed within three years from the time the DEIS was circulated, the applicable statutes require redrafting or supplementation of the DEIS under certain circumstances. In particular, a supplemental EIS is required if the agency determines that there were substantial changes in the proposed action which would significantly affect the quality of the human environment or that significant new information had come to light concerning the action's environmental aspects. *See Township of Springfield,* 702 F.2d at 435–436.[22]

In construing these requirements on review of an agency's decision not to redraft or supplement the DEIS, a court must be

---

**22.** The applicable FHWA regulations with respect to the need to supplement a DEIS provide in pertinent part:

(a) The applicant shall consult with the Administration to assure that the proposed action or environmental conditions have not significantly changed prior to proceeding with major project approvals or authorizations.
(b) The DEIS or FEIS may be supplemented at any time. Supplements will be necessary when there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures....
(c)(1) The DEIS is considered valid for a period of 3 years. If an acceptable FEIS is not submitted to the Administration within 3 years from the date of the DEIS circulation, a written evaluation of the DEIS shall be prepared by the Administration in cooperation with the applicant prior to submission of the FEIS. This evaluation must demonstrate that there have not been significant changes in the

proposed action, the affected environment, the anticipated impacts or the proposed mitigation measures. If there have been changes in these factors which would be significant in the consideration of the proposed action, a supplement to the DEIS or a new DEIS shall be prepared.
* * * * * *
(d) If any changes are made to the proposed action, and it is uncertain if a supplemental EIS is required, the applicant will develop appropriate environmental studies or, if necessary, an EA [Environmental Assessment] to assess the impacts of such changes. If it is determined that the changes result in significant environmental impacts which could not be identified from reviewing the initial EIS, a supplemental EIS will be prepared. If no supplemental EIS is required after the studies or EA required by this subsection have been made, the Administration shall so indicate in the project file.
23 C.F.R. § 771.129 (1981).

mindful that "[a] federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions [but] this does not mean, however, that supplementation is required whenever new information becomes available." *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023–24 (9th Cir.1980); *see Township of Springfield*, 702 F.2d at 439. In this regard, the Third Circuit has stated that:

> The 'ideal situation,' of course, occurs when all information contained in the Final EIS [has] been circulated in the Draft EIS, however, to require such perfection under NEPA fails to recognize the reality that new and better information may become available. Prohibiting the inclusion of updated information in a Final EIS defeats the purpose behind NEPA of encouraging a full and fair consideration of environmental effects. As the Supreme Court indicated in *Vermont Yankee Nuclear Power Corp.* an administrative process can never come to an end if the process must begin again every time new information is available. Inclusion of information in the Final EIS that was not circulated in the Draft EIS does not necessarily violate NEPA. Accordingly, agencies must be allowed some leeway to make a reasoned determination that new studies and information do not require revising and recirculating the DEIS; to do otherwise would wreak havoc upon the administrative process and might even discourage vigorous post-DEIS analysis of proposed projects.

*Id.* (citations omitted). Moreover, as a general matter, passage of new laws or changes in the state of the art do not render a previously prepared environmental document legally deficient. *Concerned Citizens on I–190 v. Secretary of Transportation*, 641 F.2d 1, 6 (1st Cir.1981).

■ In my findings of fact on plaintiffs' claim regarding redrafting of the DEIS *supra*, I have already listed the alleged substantial changes and significant new information which plaintiffs contend required redrafting and recirculation of the DEIS. A careful review of the record in light of the appropriate standard of review, has led me to conclude that plaintiffs' claims have some merit in this regard. While I believe that the defendants' decision not to redraft may have been unreasonable after the passage of six years under the circumstances presented, I nevertheless conclude for the reasons which follow, that plaintiffs are not entitled to the relief they seek at this time.[23]

The purpose of circulating significant new information as a supplemental EIS is to provide the opportunity for comment by the public and other agencies. *See Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir.1980). In the instant case, the six year time lapse following circulation of the DEIS was not followed by a final EIS. If it had been, the public would have been deprived of the opportunity to comment and attend hearings on the project in light of the substantial changes and new information. Instead, the time lapse was followed by a document entitled a preliminary final EIS. The PFEIS incorporated the substantial changes and new information and was circulated and processed just as a supplement to or redraft of the DEIS would have been. Commenting agencies thus had an opportunity to comment and responses thereto were incorporated in the FEIS. Plaintiffs have cited this court to no case which supports the proposition that in order to meet their redrafting requirements under the applicable regulations, defendants must circulate a document denominated "DEIS" as opposed to "PFEIS." Similarly, I find no caselaw to support the contention that the PFEIS did not serve to meet these requirements merely because it was not intended to do so by agency officials at that time. I therefore conclude that circulation of the PFEIS which was subject to agency comment, satisfied any burden defendants' may have had to sup-

---

**23.** Because of my conclusion in this regard, I need not discuss the substantial changes and significant new information in detail.

plement or redraft the DEIS given the lapse of time and the substantial changes and significant new information which arose during that time.

■ Having concluded that the defendants' decision not to redraft may have been unreasonable but that the PFEIS met defendants' burden in this regard, I turn now to the question of whether new corridor hearings were required and, if so, whether the "informational hearings" held subsequent to circulation of the PFEIS to the public met this requirement. Under the New Jersey Action Plan in effect at the time in question, which specifies binding legal duties for defendant NJDOT, a new corridor hearing is mandatory when:

1. location approval is not requested from the FHWA within three years after the date of the previous hearing or of the opportunity for a hearing afforded,

2. [there is] substantial change in the proposal,

3. [there is a] substantial unidentified development in the area affected by the proposal, or

4. [there is an] identification of significant social, economic or environmental effects not previously considered at earlier hearings.

New Jersey Action Plan, A.R.Vol. 2, Item 20 at VII–27; *see generally*, 23 C.F.R. § 790.3(a) (1981). Although I am persuaded that new hearings may have been required under these standards, plaintiffs have utterly failed to demonstrate to this court that the "informational hearings" held subsequent to circulation of the PFEIS substantially failed to provide the public with an opportunity to comment on the proposed project.

The "only hearing that is required by either the Administrative Procedure Act or the statutes regulating the distribution of federal funds for highway construction, is a public hearing conducted by local officials for the purpose of informing the community about the proposed project and eliciting community views on the design and route. 23 U.S.C. § 128 (1964) (Supp. V). The hearing is nonadjudicatory, quasi-legislative in nature. It is not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial-evidence review. *See* H.R.Rep. No. 1980, 79th Cong., 2d Sess." *Overton Park,* 401 U.S. at 415–16, 91 S.Ct. at 823, *see also EDF v. Brinegar,* 4 E.L.R. 20534 (E.D.Pa.1974). In short, highway hearings pursuant to 23 U.S.C. § 128 are informational hearings, not rulemaking or adversarial hearings. *Lathan v. Brinegar,* 506 F.2d 677, 691 (9th Cir.1974), *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975).

It is true that plaintiffs have pointed to agency correspondence indicating that certain individual officials may have been desirous of not reopening the issues of project location and alignment in the hearings. *See* Findings of Fact *supra.* However, there is no evidence to the effect that, even if these attitudes were those of the agency as a whole, the hearings were in fact a charade designed to deprive the public of a meaningful opportunity to comment. The fact that a preferred alternative had already been designated in no way indicates to the contrary. *See* 23 C.F.R. § 790.3(a) (1981) (requiring hearing prior to NJDOT committment to a specific proposal) and 40 C.F.R. § 1502.14(e) (sanctioning the designation of a preferred alternative in the DEIS).

**3. Plaintiffs' Claim That the FEIS was Inadequate Both in Failing to Demonstrate Any Bona Fide Need for the Project and in Making False Statements that Would Lead a Decisionmaker to Erroneously Conclude That a Need Had Been Shown.**

Plaintiffs claim that the FEIS fails to establish a need for completion of I–287 and that the asserted defense and traffic related justifications are based on flawed technical studies. In considering such claims I am cognizant that the fundamental policy decision to build and maintain an interstate system of highways is "not subject to reexamination in the federal courts under the guise of judicial review of agency action." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558,

98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). In short, the role of a court in deciding a NEPA case:

> ... is not to determine the legislative, administrative or political wisdom behind the Government's decision to approve the building of the segment of I–287 under discussion, or, for that matter, to determine if I–287 is really needed in the ... community and what its short and long range impacts upon that community might be. Rather, the sole task of the Court in litigation wherein the plaintiffs seek review of an administrative decision, is to determine if the administrative action is either "arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with law," *or* if the action failed to meet statutory, procedural or constitutional requirements.

*See Citizens Committee Against Interstate Route 675 v. Lewis*, 542 F.Supp. 496, 521 (S.D.Ohio 1982) (emphasis in original).

Moreover, although this court has held that plaintiffs may properly submit their own expert reports in an effort to demonstrate that the agency decision to build was arbitrary and capricious under the governing standards, as I have already noted *supra*, mere disagreement among experts will not serve to invalidate an EIS. *Life of the Land v. Brinegar*, 485 F.2d at 472–73. In sum, if reasonable persons could rely on the agency's studies to reach the agency's conclusion, the conclusion is not arbitrary. *Commonwealth of Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 720 (6th Cir.1981). *See also Committee for Nuclear Responsibility v. Seaborg*, 463 F.2d 783, 787 (D.C.Cir.1971); *see* my discussion *supra*.

■ After carefully reviewing the administrative record as a whole and the technical studies accompanying the FEIS in particular, and after careful consideration of the opinions of plaintiffs' experts, I have concluded that the agency determination that the completion of I–287 was needed was neither arbitrary nor capricious. The need for project completion has been confirmed by Congress. *See* 97 Stat. 329,

Pub.L. 98–63 (July 1983). While the asserted defense need for the project may be in need of updated evaluation, the record contains ample demonstration of the need for the project to facilitate interstate travel and to avoid projected traffic congestion. Although plaintiffs' experts disagree with the methodology utilized in the technical studies on these issues, their disagreement is insufficient to render the decision to build arbitrary or capricious under the governing law discussed *supra*.

**4. Plaintiffs Claim That the FEIS Failed to Perform the Legally Required Rigorous Analysis of Alternatives to the Project, Including Alternative Routes, the No-build Alternative, and the Alternatives of Upgrading Existing Highway Facilities, As Well As of Trading In Funds for I–287 to Facilitate Such Upgrading or Undertake Other Approved Highway Projects.**

As stated in my conclusions of law regarding plaintiffs' first claim *supra*, an EIS, whether draft or final, must consider alternatives to the project as proposed. The Supreme Court has noted that "[t]he term 'alternatives' is not self defining. To make an impact statement something more than an exercise in frivolous boiler plate, the concept of alternatives must be bounded by some notion of feasibility." *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. at 1215. In other words, the law does not require the agency to "ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Vermont Yankee Power Corp. v. NRDC*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned. *NRDC v. Morton*, 458 F.2d 827, 837 (D.C. Cir.1972).

■ Both the FEIS and the DEIS, *see* my discussion *supra*, review a wide variety of alternative alignments as well as the "no build" and "upgrade existing facilities" alternatives. Both documents describe the

alternatives and their expected environmental impacts, give reasons for rejection of all but the preferred alternative and set forth reasons for selection of the preferred alternative. I therefore conclude that defendants made reasonable decisions regarding which alternatives to consider, studied all feasible, prudent alternatives and chose a preferred alternative which choice was neither unreasonable nor arbitrary and capricious under governing standards. The FEIS is not defective in this regard.

**5. Plaintiffs' Claim That Defendants Violated Sections 128 and 134 of the FAHA.**

▮▮▮ The FAHA requires coordination of federal highway projects with state and local goals and objectives. Section 128 of the FAHA provides, in pertinent part, as follows:

> (a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it ... has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.

23 U.S.C.. § 128(a). Section 134(a) of the FAHA states:

> To accomplish th[e] objective [of developing] transportation systems embracing various modes of transportation in a manner that will serve the States and local communities efficiently and effectively ... the Secretary shall cooperate with the State and local officials in the development of transportation plans and programs which are formulated on the basis of transportation needs with due consideration to comprehensive long-range land use plans, development objectives, and overall social, economic, environmental, system performance, and energy conservation goals and objectives, and with due consideration to their prob-

able effect on the future development on urban areas of more than fifty thousand population. The planning process shall include an analysis of alternative transportation system management and investment strategies to make more efficient use of existing transportation facilities. The process shall consider all modes of transportation and shall be continuing, cooperative, and comprehensive to the degree appropriate based on the complexity of the transportation problems.

23 U.S.C. § 134(a).

A careful review of the record and of my findings of fact regarding this claim unequivocally support the conclusion that defendants have fully complied with the mandates of the statutory sections quoted above.

**6. Plaintiffs' Claim That the FEIS Failed to Adequately Consider and Analyze the Substantial Adverse Land Use and Socio-economic Impacts of Constructing the Highway.**

▮▮▮ I have concluded that defendants have fully considered all adverse land use and socio-economic impacts of construction of I-287. As noted *supra*, the FEIS was accompanied by an entire technical study addressed to these issues and I do not believe the FEIS was defective in this regard.

**7. Plaintiffs Claim That Defendants' Inadequate Consideration of Adverse Impacts Upon Wetlands and Their Failure to Devise Appropriate Mitigation Measures Constitute Violations of NEPA and Executive Order 11990.**

▮▮▮ Executive Order 11990 requires each Federal agency to evaluate the potential impact of any action in a floodplain on wetlands and to avoid construction in such areas unless the agency finds 1) that there is no practicable alternative and 2) that the proposed action includes all practicable measures to minimize harm to such wetlands. E.O. 11990 is binding on USDOT. *See, e.g.*, DOT Order No. 5660.1A, 43 Fed. Reg. 42,285 (August 24, 1978). The wording of E.O. 11990 on wetlands is however

"less prohibitive" than other statutes and "contemplates more balancing of other factors. The test for determining whether an alternative propounded by agencies is practicable ... is whether it is capable of attainment within relevant, existing constraints." *National Wildlife Federation v. Adams,* 629 F.2d 587, 591–92 (9th Cir. 1980). Because E.O. 11990 provides no private right of action, defendants compliance therewith is reviewable pursuant to the APA, 5 U.S.C. § 706(2)(A) only to determine whether the agency action was arbitrary, capricious or an abuse of discretion under the mandates of the Executive Order.

■ At the outset I note that defendants argue that E.O. 11990 is inapplicable by its terms to projects for which a draft or final EIS was filed prior to October 1, 1977. I agree with plaintiffs that E.O. 11990 is applicable to the I-287 project. First, the FEIS itself declares that it is in compliance with E.O. 11990 thus subjecting itself to the requirements therein, *see Sierra Club v. Sigler,* 695 F.2d 957, 966 n. 7 (5th Cir. 1983). Second, I am not at all certain that the terms of E.O. 11990 were intended to preclude its applicability where a DEIS was filed before 1977 but where a federal court determines redrafting may have been required and where defendants did in fact redraft and recirculate the DEIS in the form of a PFEIS after 1977. *See* my discussion *supra.*

■ I agree, however, with defendants that the FEIS is in compliance with the requirements of E.O. 11990. The FEIS contains a formal "wetlands finding," A.R., Vol. 24, Item 101 at 106–109, and impacts on wetlands are considered throughout. *Id.* at 1–7, III–28, 33, 44–59, 105–110, V–59 to 71, 80, 87–103, 142, 151, 160; *see also* A.R., Vol. 17, Item 78C. Vols. XIII and IX. While plaintiffs' experts point to certain alleged flaws in defendants methodology in this regard, even if true, this would not support a finding that the agency had acted in an arbitrary or capricious manner. The FEIS at III–48 to 49 and at 46 demonstrates that all of the alternative alignments would involve construction on wetlands and notes the excessive taking of

residential properties which would be necessitated by some leading to the conclusion that there is no practicable alternative.

As to mitigation, the FEIS at III–108 ennumerates mitigation measures that will be taken, and the agency's committment to minimizing harm to wetlands is affirmed at V–88 and V–90.

■ As the Third Circuit has recognized, an FEIS may be validly approved by the agency even though conditioned on further development of mitigation measures. *Township of Springfield,* 702 F.2d at 451. Since the environmental process is a continuing one, it is not necessary, nor is it possible, that every detail be contained in the FEIS. General commitments to future action suffice to meet mitigation requirements. *National Wildlife Federation v. Lewis,* 519 F.Supp. 523 (1981), *aff'd,* 677 F.2d 259 (2d Cir.1982). The sufficiency of an FEIS cannot be attacked by its failure to include design details. Mitigation measures and design features are frequently finalized, added or changed as a result of public input and agency comment. *Citizen Expressway Coalition Inc. v. Lewis,* 523 F.Supp. 396, 402 (E.D.Ark.1981), *aff'd,* 685 F.2d 437 (8th Cir.1982). *See also Township of Springfield,* 702 F.2d at 437–38.

Under these standards, I conclude that whether under NEPA, *see, e.g., Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1339 (S.D.Tex.1973); *Stop H-3 Ass'n v. Brinegar,* 389 F.Supp. 1102, 1111 (D.Hawaii 1974), *rev'd on other grounds and remanded sub nom., Wright v. Stop H-3 Ass'n,* 533 F.2d 434 (9th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976), or under E.O. 11990, defendants have met all requirements regarding the project's impact on wetlands and the requisite measures and commitment to mitigation and minimization of those impacts.

**8. Plaintiffs' Claim That Defendants Inadequate Consideration of Adverse Impacts Upon Floodplains and Their Failure to Devise Appropriate Mitigation Measures Constitute Violations of NEPA and Executive Order 11988.**

■ Executive Order 11988 directs federal agencies to evaluate potential impacts

of a proposed action in a floodplain and to avoid taking such action unless it is the "only practicable alternative." The standard of review is as set forth *supra* with regard to E.O. 11990. FHWA regulations implementing E.O. 11988 require an "only practicable alternative" written "finding" only when the proposed action involves significant encroachment on floodplains. 23 C.F.R. 650.113(a). Thus, when an agency has concluded that a project will not have a significant impact on floodplains, no written findings are required by floodplain regulations or E.O. 11988. *See Sierra Club v. Hassell*, 636 F.2d 1095, 1100 (5th Cir.1981). As with E.O. 11990, defendants have voluntarily assumed their obligations under this Executive Order.

▇▇▇ Defendants reviewed the impacts to floodplains and determined that the impacts would be "minimal." *See* A.R., Vol. 24, Item 101 at 109–110. This conclusion finds some support in the record. *See* A.R., Vol. 24, Item 101 at III–44 to 59, III–109 to 110, 154, 157, V–59 to 71; *see also* A.R., Vol. 17, Item 78C at XIII and IX. While the factual bases in the record for the agency's conclusion that the impact to floodplains would be "minimal" are not plentiful and plaintiffs' experts opine that defendants' methodology is flawed in this regard, I do not believe plaintiffs have demonstrated by a preponderance of evidence that the agency acted arbitrarily with regard to its consideration of floodplain impacts. I therefore conclude, under the applicable standard of review, that defendants have adequately complied with E.O. 11988. I further conclude, for the same reasons, that defendants have complied with NEPA regarding consideration of the alleged impact of floodplain encroachment on contamination of the Towaco Valley Aquifer.

**9. Plaintiffs' Claim That the EIS Failed to Fairly and Adequately Consider the Impacts of the Project on Wildlife Generally in Violation of NEPA.**

It is undisputed that as a general matter, demonstrable likelihood of significant harm to wildlife constitutes a significant environmental impact within the meaning of NEPA. It is further undisputed that NEPA requires that probable impacts on wildlife be presented in sufficient detail in an EIS to enable a decisionmaker to consider them meaningfully, and to evaluate different alternatives in terms of their comparative effects on wildlife. In particular, plaintiffs contend that the FEIS is inadequate because it does not disclose or enable a decisionmaker to meaningfully assess the project's direct and secondary development impacts on: (a) state endangered animal species and rare plant species in the project area, and (b) wildlife generally.

▇▇▇ After careful consideration of the administrative record, I have concluded that the FEIS and accompanying technical studies demonstrate that the defendant decision-makers took a hard look at the consequences of their actions regarding wildlife. *See, e.g.,* FEIS at II–4 to 7; III–32–35; III–103 to 105 and A.R., Vol. 18, Item 78D (Technical Study on Natural Ecosystems). I am cognizant that plaintiffs' experts believe otherwise but for reasons discussed elsewhere in this opinion, a mere disagreement among experts does not support a finding that the agency's consideration of impacts on wildlife was so inadequate as to render the agency decision to proceed, arbitrary and capricious under governing standards. Similarly, although the comments of the Fish and Wildlife Service may criticize the FEIS in this regard, NEPA requires only that the agencies consider and respond in a meaningful manner to these comments. *See generally, Committee for Nuclear Responsibility v. Seaborg*, 463 F.2d 783, 787 (D.C.Cir.1971). The agency has done so here, I therefore conclude that defendants have not violated NEPA's requirements with regard to state endangered species or wildlife generally.

**10. Plaintiffs' Claim That Defendants NJDOT and FHWA violated the Endangered Species Act by Failing to Consult, to Prepare a Biological Assessment and to Determine the Project's Impacts Upon the Endangered Small Whorled Pogonia.**

The Endangered Species Act requires project sponsors to consult and prepare a

biological assessment where a project has an adverse impact on a listed species. 16 U.S.C. §§ 1536(a), and (c). This section was amended October 13, 1982 to require such an assessment with respect to species that will be affected, *i.e.,* species which have been formally proposed for listing. *See* Pub.L. 97–304 (October 13, 1982). As set forth in my findings of fact *supra,* the orchid in question was placed on the endangered species list on September 10, 1982, effective October 12, 1982. 47 Fed.Reg. 39827 (1982).

Courts construing the Act prior to its amendment have held that biological assessment is not required when there is no evidence indicating that a listed or proposed species is present. *Mobil Oil Corp. v. ICC,* 685 F.2d 624, 640–641 (D.C.Cir. 1982). As plaintiffs' correctly note, however, the DOI twice notified defendants that the small whorled pogonia had been proposed for listing. *See* Findings of Fact *supra.* It is sufficient, however, for the EIS to state that "if any endangered species are discovered during the ongoing studies over the rest of the [project], formal consultation will again be instituted." *Mobil Oil Corp.,* 685 F.2d at 641.

 Plaintiffs contend that until such time as defendants consult with the FWS regarding the pogonia and prepare a biological assessment to determine whether it would be affected by the project they are in violation of the Endangered Species Act and may not proceed with construction of the highway. As stated in my findings of fact, when this issue was raised by plaintiffs for the first time in their point briefs, defendants promptly consulted with DOI regarding the small whorled pogonia. I find that this consultation was sufficient. Moreover, because I find that there is no evidence presented by plaintiffs or contained in the record to indicate that the endangered species of pogonia can be found at the project location at this time, plaintiffs cannot prevail on this claim even if this post litigation consultation with DOI were not sufficient as a matter of law. Given the governing standard of review and the statement in the notice of review that none of the species in question "are now known to exist" in Franklin Lakes, *see* findings of fact *supra,* plaintiffs have failed to demonstrate by a preponderance of evidence that defendants' decision not to study and consult regarding the small whorled pogonia was arbitrary or capricious at the time. In fact, to the contrary, it was eminently reasonable.

**11. Plaintiffs' Claim That Defendants NJDOT and FHWA Have Violated the Fish and Wildlife Coordination Act.**

 The Fish and Wildlife Coordination Act (FWCA) requires an agency to consult with the FWS "with a view to the conservation of wildlife rsources" whenever a proposed action may have an impact on such resources. 16 U.S.C. § 662(a).[24] Defendants consulted with both FWS and NJDEP. These agencies commented on the DEIS and FEIS and the defendant agencies responded to these comments. I note that "[t]he Fish and Wildlife Coordination Act does not require that an agency's decision correspond to the view of the Fish and Wildlife Service. Rather, the Act requires that these views be given serious consideration." *Sierra Club v. Alexander,* 484 F.Supp. 455, 470 (N.D.N.Y.1980); *Lake*

---

**24.** Section 662(a) states:

Except as hereinafter stated in subsection (h) of this section, whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other controlled facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.

*Erie Alliance v. U.S. Army Corps of Engineers,* 526 F.Supp. 1063, 1081, (W.D. Penn.1981), *aff'd,* 707 F.2d 1392 (3d Cir. 1982).

Moreover, I have already concluded that defendants acted in compliance with NEPA in their consideration of wildlife generally. *See* my discussion of plaintiffs claim No. 9 *supra.* Courts have held that compliance with NEPA "will automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require an agency to do both separately. *EDF, Inc. v. Froehlke,* 473 F.2d 346, 356 (9th Cir.1972)." *State of Missouri ex rel. Ashcroft v. Department of the Army,* 526 F.Supp. 660, 677 (W.D. Mo.1980). Thus, as a general matter, "[a]ny separate claim that defendants are not complying with FWCA is merged with and subsumed by [the plaintiffs'] claim in the counts based in NEPA." *Environmental Defense Fund v. Alexander,* 501 F.Supp. 742, 767 (N.D.Miss.1980).

**12. Plaintiffs' Claim That Defendants FHWA and NJDOT Violated the Requirement of FAHA That They Develop a Detailed Soil Erosion Control Plan.**

Section 109(g) of Title 23 of the United States Code provides in pertinent part:

The secretary shall issue ... guidelines for minimizing possible soil erosion from highway construction. Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines.

Thus, 23 U.S.C. § 109(g) requires only that the Secretary of Transportation issue guidelines for minimizing possible soil erosion and that such guidelines apply to all future proposed projects at the PS & E stage (a stage not yet reached in the I–287 project). *See* 23 U.S.C. § 106. The Secretary did, in fact, issue guidelines which are found at 23 C.F.R. Part 650, Subpart B (sections 650.201–650.209) entitled "Erosion and Sediment Control on Highway Construction Projects." Section 650.207 states:

Emphasis shall be placed on erosion control in the preparation of plans, specifications and estimates ...

(b) all reasonable steps shall be taken to ensure that highway project designs for the control of erosion and sedimentation and the protection of water quality comply with applicable standards and regulations of other agencies.

Defendants' commitment to soil erosion control, as stated in the FEIS, is all that is required by NEPA and the FAHA. *Concerned Citizens On I–190 v. Secretary of Transportation,* 641 F.2d 1, 5 (1st Cir. 1981); *Maryland Wildlife Federation v. Lewis,* 560 F.Supp. 466, 475 (D.Md.1983). *See also Township of Springfield,* 702 F.2d at 437–38, 451. In short, an EIS is adequate on the subject of soil erosion if it "demonstrates a clear recognition of the problem, provides notice of the significance of the problem to those who read it, and evinces a concern for and a commitment to the mitigation of such danger." *Concerned Citizens on I–190,* 641 F.2d at 5.

Soil erosion requirements apply to the plans, specifications, and estimates (PS & E) for a project. *See* 23 U.S.C. 106, 109(g). FHWA regulations require only that the effects of the project on soil erosion and sedimentation be considered and discussed to the extent applicable prior to PS & E approval, not that a soil erosion plan be prepared. 23 C.F.R. § 790.3(c)(2), 790.-8(b)(c). Plans, specifications, and estimates cannot be approved until both corridor and design hearings have been held, 23 C.F.R. 790.9(e)(1), and an EIS has been prepared and approved, 23 C.F.R. 771.113, 40 C.F.R. § 1500.1(b), 1501.2, 1502.5, 1506.10. Based on the foregoing, I have concluded that a soil erosion plan is not required until after an EIS is prepared and approved, and that all requirements of law regarding soil erosion to date have been satisfied by the defendants.

**13. Plaintiffs' Claim That Defendants NJDOT and FHWA Violated the Intergovernmental Cooperation Act.**

The Intergovernmental Cooperation Act (ICA) requires consultation with other ex-

ecutive agencies and an effort toward consistency with local planning objectives. In particular, the pertinent statutory sections are as follows:

To the maximum extent possible and consistent with national objectives, assistance for development purposes shall be consistent with and further the objectives of State, regional, and local comprehensive planning.

31 U.S.C. § 6506(d).

To the maximum extent practicable, each executive agency carrying out a development assistance program shall consult with and seek advice from all other significantly effected executive agencies in an effort to ensure completely coordinated programs.

*Id.* at § 6506(e). The ICA does not require that a federal agency incorporate the views of local planning agencies, but rather requires such views to be fully considered. *City of Rochester v. U.S. Postal Service,* 541 F.2d 967, 976 (2d Cir.1976).

 As a result of defendants' efforts to fulfill their duties in this regard, the project received the concurrence of the Tri-State Regional Planning Commission, the official regional planning agency for the metropolitan area of New York, Connecticut and New Jersey. Furthermore, the New Jersey Department of Community Affairs, Division of Planning commented that the preferred alignment is "essentially consistent with the State Development Guide Plan, dated May, 1980, and . . . is generally compatible with applicable regional and county plans as well." FEIS at V–72. The Administrative Record is also replete with documentation of the conferences and correspondence among all concerned local, state, regional and federal agencies and citizen groups. The record further evidences modifications and mitigation measures adopted in response to local concern. Every federal and state agency having jurisdiction or special expertise received copies

of the DEIS and PFEIS for to comment. Comments were received and responded to in the FEIS. *See* FEIS at V–72 to 104; V–132 to 172. On this record, it is evident that the I–287 project encompassed years of coordination and meetings with local officials. I therefore conclude that defendants have fully complied with the requirements of the ICA quoted *supra.*

**14. Plaintiffs' Claim That Defendant EPA Has Violated Section 309 of the Clean Air Act.**[25]

Section 309(b) of the Clean Air Act provides in pertinent part as follows:

In the event the Administrator determines that any such legislation, action, or regulation is unsatisfactory from the standpoint of public health or welfare, or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality.

42 U.S.C. § 7609(b). In accordance with the above-cited section, EPA's procedures provide that it classify an EIS presented to it as follows:

LO—Lack of objection

ER (1) (2) or (3)—environmental reservation

EU—environmentally unsatisfactory

Pursuant to this classification system, the EPA classified the project as "ER–2", *i.e.,* environmental reservation, level 2.

EPA stated in its comment on the DEIS, in pertinent part as follows:

According to EPA procedures, we have rated this [DEIS] EIS as ER–2 indicating that we have environmental reservations concerning its effects and that additional information is required in order to complete our review.

FEIS at V–150.

 Thus, contrary to plaintiffs' contention, EPA did not find the I–287 project

**25.** Defendants have argued that plaintiffs have waived this claim by failing to address it in their compilation of point briefs submitted to this court. Although it is true that in a prior ruling plaintiffs were cautioned to limit all submissions of extra-record evidence to claims already briefed; I in no way ruled that plaintiffs would waive all other claims. Instead I ruled only that no extra-record evidence would be considered regarding such claims.

to be environmentally unsatisfactory. Accordingly, EPA was not required to refer the matter to the Council on Environmental Quality (CEQ). The EPA rating is "within the full discretion of the Administrator and places no duty upon him to publish or go to the CEQ unless he deems the action unsatisfactory." *Sierra Club v. Morton*, 379 F.Supp. 1254, 1262 (D.Colorado 1974). I therefore conclude that defendant EPA did not violate the Clean Air Act as plaintiffs have alleged.

**15. Plaintiffs' Claim That Defendants Have Not Submitted the Complete Administrative Record, Thus Judgment May Not Be Rendered In Their Favor.**

For the reasons set forth in my findings of fact *supra,* in my discussion of the scope of review *supra* and in the prior rulings of this court as cited therein, I have concluded that plaintiffs are not entitled to judgment on this ground.

### IV. CONCLUSION

In sum, I have concluded that the challenged agency decision to proceed with the construction of I–287 was neither arbitrary, capricious nor an abuse of discretion. Further, I have concluded that defendants substantially complied with the procedural requirements of the governing laws in that the agencies in question adequately considered the environmental impacts of the proposed project, did not ignore any reasonable alternatives known to them and satisfied their obligations to the public and to all commenting and consulting agencies by circulating a preliminary FEIS in lieu of redrafting or supplementing the DEIS.

Finally, I note that the parties herein have admirably and zealously advocated their respective positions over the course of this litigation. While plaintiffs have advanced substantial arguments in their favor, my review of the record and of the essentially procedural rights which plaintiffs assert has led me to conclude that these rights have been fully protected throughout the thirty years since I–287 was first designated as part of the interstate highway system.

Forty-six volumes of administrative record have been filed with this court. Those volumes reveal three environmental impact statements with fully two rounds of public hearings, agency comments and responses by the defending agencies herein. Volumes upon volumes of technical studies have been done and redone in an effort to consider all impacts of the project and to meet all legal requirements. Task forces, commissions and committees have been set up to study, advise and consult regarding various aspects of the project. To nullify such an exhaustive effort, or to remand for more of the same, without "substantial procedural or substantive reasons as mandated by statute," would indeed "border[ ] on the Kafkaesque." *See Vermont Yankee,* 435 U.S. at 557–58, 98 S.Ct. at 1218–19.

For the reasons set forth in this opinion, judgment shall be entered in favor of the defendants on all of plaintiffs' claims.